# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 15-4268 JB

EDWARD TROUP, a.k.a. "Huero Troup,"

      Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) Defendant Edward Troup's Objections to the Presentence Investigation Report (Doc. 2591) and Motion to Strike Paragraphs 6-13, 17, 18, 20, 21, 26-31, and 65 of the Presentence Investigation Report and Motion to Order the Government to Include These Objections in the Materials Sent to the Bureau of Prisons BOP, filed April 26, 2019 (Doc. 2621)("Objections"); and (ii) Edward Troup's Conditional Motion for Downward Variance, filed May 10, 2019 (Doc. 2648)("Motion"). The primary issues are: (i) whether, under § 2E1.3 of the United States Sentencing Guidelines Manual (U.S. Sentencing Comm'n

---

[1]Although Defendant Edward Troup filed ex parte Edward Troup's Objections to the Presentence Investigation Report (Doc. 2591) and Motion to Strike Paragraphs 6-13, 17, 18, 20, 21, 26-31, and 65 of the Presentence Investigation Report and Motion to Order the Government to Include These Objections in the Materials Sent to the Bureau of Prisons BOP, filed April 26, 2019 (Doc. 2621), and Edward Troup's Conditional Motion for Downward Variance, filed May 10, 2019 (Doc. 2648), the Court does not file this Memorandum Opinion and Order under seal, because at the sentencing hearing, Troup agreed that these pleadings should be unsealed, and the Court stated that they would be unsealed. See Draft Transcript of Hearing at 51:11-13, 22-25, taken May 15, 2019 (Burke, Court).

The Court's citations to the transcript of the sentencing hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

2018)("U.S.S.G."),[2] the underlying crimes are first-degree murder for Defendant Edward Troup's conviction of two Counts under 18 U.S.C. § 1959(a)(1), establishing a base offense level of 43 pursuant to U.S.S.G. § 2A1.1; (ii) whether the 2-level enhancement under U.S.S.G. § 3A1.1(b)(1) for a vulnerable victim applies to both Counts, because the two victims were incarcerated; (iii) whether the 2-level enhancement under U.S.S.G. § 3A1.3 for restraint of victim applies to both Counts, because the victims were killed in close quarters in their prison cells; (iv) whether a 2-level reduction under U.S.S.G. § 3B1.2(b) is appropriate for both Counts, because Troup

---

[2]The Supreme Court of the United States held in Peugh v. United States, 569 U.S. 530 (2013):

> District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described. The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes.

569 U.S. at 549 (emphasis in original). The 2018 Guidelines Manual provides, however, that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced" unless doing so "would violate the *ex post facto* clause of the United States Constitution," in which case "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(a)-(b)(1). Further, where the defendant is convicted of two offenses to which different versions of the Guidelines Manual applies, the court uses the revised edition. See U.S.S.G. § 1B1.11(b)(3). Troup murdered Frank Castillo on March 26, 2001, and murdered Freddie Sanchez on June 17, 2007, see Second Superseding Indictment at 9, 10-11, filed March 9, 2017 (Doc. 947), so the 2006 Guidelines Manual, effective November 1, 2006, would apply to both offenses if the Court does not use the current Guidelines Manual, see U.S.S.G. § 1B1.11(b)(3). Using the 2006 Guidelines Manual does not change the result here. See U.S.S.G. § 1B1.11(b)(1). Accordingly, the Court uses the 2018 Guidelines Manual.

maintains that his role in both homicides was minor; (v) whether a downward departure under U.S.S.G. § 4A1.3 is warranted, because the Presentence Investigation Report, filed March 20, 2019 (Doc. 2591)("PSR"), having calculated his criminal history level at VI from 25 criminal history points overrepresents Troup's criminal history; (vi) whether the Court should strike the PSR's paragraphs 6-13, 17-18, 20-21, and 26-31, because the United States Probation Officer ("USPO") relied on the prosecutors' files to find the facts in these paragraphs rather than the trial transcripts, or the PSR's paragraph 65, because the USPO could not find details of the offense contained in this paragraph; and (vii) whether a downward variance is appropriate, because the Guidelines' range is harsher than necessary to achieve 18 U.S.C. § 3553(a)'s sentencing objectives. The Court held a sentencing hearing on May 15, 2019. The Court concludes that: (i) there is evidence to find, by a preponderance, that the underlying crimes for the 18 U.S.C. § 1959(a)(1) offenses are first-degree murder, establishing a base offense level of 43 pursuant to U.S.S.G. § 2A1.1, so the Court overrules this Objection; (ii) the homicide victims' status as prisoners and as targets of the Syndicato de Nuevo Mexico ("SNM") for hits establishes them as vulnerable under U.S.S.G. § 3A1.1(b)(1), so the Court overrules this Objection; (iii) the victims were physically restrained in small, enclosed areas, which establishes that they were restrained under U.S.S.G. § 3A1.3, so the Court overrules this Objection; (iv) there is not a preponderance of the evidence to find that Troup's role in the murders was minor, so the Court overrules this Objection; (v) the PSR does not overrepresent Troup's criminal history because the PSR presents an accurate representation of the

seriousness of Troup's criminal history and Troup's likelihood of recidivism, so no downward departure is warranted, and the Court overrules this Objection; (vi) the USPO should not rely on prosecutors' notes to find facts where there has been a trial, but because the Second Addendum to the Presentence Report, filed May 14, 2019 (Doc. 2654)("Second Addendum") maintains that these facts are accurate and cites to the trial transcripts, and because the USPO verified conviction and information contained in paragraph 65, the Court overrules these Objections; and (vii) the Guidelines' range of life is adequate and necessary to promote 18 U.S.C. § 3553(a)'s sentencing objectives, so a downward variance is not warranted. Accordingly, the Court overrules the Objections and denies the Motion.

## FACTUAL BACKGROUND

Troup is one of many Defendants named in a sixteen-Count indictment charging "members/prospects/associates of the" SNM with "acts of violence and other criminal activities, including[] murder, kidnapping, attempted murder conspiracy to manufacture/distribute narcotics, and firearms trafficking." Second Superseding Indictment ¶ 1, at 2, filed March 9, 2017 (Doc. 949)("Indictment"). The Indictment alleges that the SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment ¶ 2, at 2-3. The Court has provided background information on the SNM in a number of prior opinions, including in its Memorandum Opinion and Order, 287 F. Supp. 3d

1187, filed March 7, 2018 (Doc. 1882)("MOO").  The Court provides this information, which is

garnered from the Indictment, purely to provide background information on this case and

recognizes that this information reflects largely Plaintiff United States of America's version of

events:

> SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. . . . Indictment at 3.  During the riot, thirty-three inmates were killed, and over 200 were injured.  See . . . Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members.  See Indictment at 3.  SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members."  Indictment at 3.  SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking.  See Indictment at 3-4.  Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Indictment at 4.  If another gang does not abide by SNM's demands, SNM will assault or kill one of the other gang's members to show its power.  See Indictment at 4.  SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system.  See Indictment at 4.  SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  Indictment at 4.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder.  See Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See Indictment at 8.  SNM's recent activities in a conspiracy to murder high-ranking

New Mexico Corrections Department Officials inspired the Federal Bureau of Investigation's present investigation. See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133).

. . . .

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts. See Indictment at 1, 9-18. All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity." Indictment at 9-18. Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta, Defendant Benjamin Clark, [Defendant Mario] Rodriguez, Defendant Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez, and [Defendant Daniel] Sanchez are the enterprise's alleged leaders. See Indictment at 6. The other Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders. See Indictment at 6. The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846. Indictment at 9.

. . . .

For fuller factual context, there are now four cases before the Court related to SNM's alleged criminal activity. In a related case -- United States v. Baca, No. CR 16-1613, 2016 WL 6404772 (D.N.M.)(Browning, J.) -- the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d). There is also a separate prosecution of [Defendant Christopher] Garcia for drug crimes, see United States v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant

prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C.
§ 1959.  See United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

MOO at 5-12, 287 F. Supp. 3d at 1195-99 (footnotes omitted)(first four alterations in the MOO,

last two added).  The Indictment charges Troup in two Counts: (i) Count 1's violent crimes in aid

of racketeering activity, 18 U.S.C. § 1959(a)(1), (2), violation for the March 26, 2001, murder of

Frank Castillo; and (ii) Count 3's violent crimes in aid of racketeering activity, 18 U.S.C.

§ 1959(a)(1), (2), violation for the June 17, 2007, murder of Freddie Sanchez.  See Indictment at

9-11.

On April 9, 2018, the Court began jury selection for the trial on the Indictment's Counts 1-

5 and 13-16.  See Clerk's Minutes at 6-7, filed April 9, 2018 (Doc. 2324)("Trial Minutes").  Troup

went to trial with six co-Defendants, three of whom were also charged with Troup in Counts 1 and

3.  Compare Trial Minutes at 6 (stating that, among others, Defendants Joe Gallegos, Troup, Billy

Garcia, and Arturo Arnulfo Garcia went to trial), with Indictment at 9 (charging, among others,

Gallegos, Troup, and B. Garcia with Castillo's murder), and Indictment at 10-11 (charging, among

others, Troup and A.A. Garcia with Sanchez' murder).  The parties gave their opening statements

on Thursday, April 12, 2018.  The United States began its case in chief the same day.  See Trial

Minutes at 11.

The Court takes the offense conduct facts from the PSR and the Second Addendum,

because, although Troup objects to portions of the PSR's recitation of the facts based on the PSR's

reliance on the United States' files rather than the evidence revealed at trial, the Second Addendum

relies on trial transcripts to determine that the PSR's information is accurate. See, e.g., Objections at 2. See also Draft Transcript of Hearing at 46:2-19, taken May 15, 2019 (Burke, Court)("Tr.")(providing Troup's agreement with the Court's suggestion to overrule the factual Objections, because the Second Addendum relies on trial transcripts). The Court's findings of fact on Castillo's murder for this sentencing are as follows:

14.     On March 26, 2001, officers with New Mexico State Police (NMSP) Criminal Investigations were advised by officials at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico that an inmate was discovered dead in his cell. Upon arrival, NMSP investigators were informed the victim, identified as F.C., [who] appeared to have been strangled. Investigators were also advised F.C. was a member of the SNM gang.

15.     When questioned, inmate **Edward Troup** denied knowing F.C. and being involved in F.C.'s death.

16.     On March 27, 2001, a report of findings was completed by the Office of the Medical Investigator regarding F.C.'s autopsy. The autopsy report revealed a tightly rolled laundry bag was around F.C.'s neck and was twisted around itself. The ligature passed just below the mouth across the upper part of the chin and wrapped tightly around the back of the neck just below the base of the skull. Upon removal of the ligature from the upper neck and chin, a depressed ligature abrasion around the neck and lower face remained. The following injuries were noted: the face and chest were marked with postmortem lividity; petechial hemorrhages were extremely apparent within both eyes; there was hemorrhaging within the left sternocleidomastoid muscle of the lower neck; there was a large contusion on the upper chest area and left shoulder that was not apparent on the surface of the skin due to the high levels of livor mortis; there was a 1 ½ x ¾ inch contusion on the right hip; and there were several abrasions and contusions of both knees as well as on the left foot. The cause of death was identified as ligature strangulation, and it was ruled a homicide.

17.     According to a statement made on July 22, 2003 by a confidential informant (CI), who was an inmate at the SNMCF, the morning of F.C.'s murder, the CI

observed **Troup** and Angel DeLeon sitting on the bed in **Troup's** cell removing the string from a laundry bag. The CI then observed Joe Gallegos talking with F.C., both of whom were in the upstairs portion of the pod. As the CI returned to his cell, he observed **Troup** sitting on a table, and F.C.'s door was closed. The CI started to walk up the stairs when **Troup** warned him not to go up the stairs; however, the CI continued to his cell, at which time, he heard a sound consistent with a door being kicked coming from F.C.'s cell. The CI observed **Troup** go to F.C.'s cell door and kick it in order to keep it closed. The CI entered his cell but continued to look out when he observed DeLeon and Gallegos exit F.C.'s cell and walk straight to the showers.

18.    The CI stated they were all called to go to breakfast, and he walked with DeLeon, who told the CI that Gallegos and F.C. had been in F.C.'s cell shooting up heroin. When it was F.C.'s turn, DeLeon stated he grabbed F.C.'s arm, and Gallegos wrapped the string around F.C.'s neck. F.C. attempted to get away; however, **Troup** pushed the cell door closed to keep it from opening and to prevent F.C. from escaping. DeLeon stated he continued to hold F.C., while Gallegos strangled him. It was during breakfast when F.C. was found murdered in his cell. The CI indicated Gallegos showed him a burn mark on his hand, which he admitted he received when he strangled F.C.

19.    On September 12, 2007, NMSP officers met with Leonard Lujan to conduct a follow-up interview regarding F.C.'s murder. According to Lujan, Billy Garcia advised he wanted F.C. "removed". Although Garcia wanted other inmates murdered, he wanted F.C. killed first by strangulation. Lujan admitted he ordered Gallegos and DeLeon to murder F.C. Lujan further admitted Gallegos and DeLeon had "green lights" on them, and their names would be cleared by murdering F.C. On October 17, 2007, Lujan positively identified Gallegos and DeLeon in a photo lineup as the individuals he ordered to carry out F.C.'s murder. It was later revealed F.C. was murdered, because he allegedly provided information to law enforcement regarding criminal activity.

20.    In late November 2012, a CI spoke to **Troup** while they were at a house in Albuquerque, New Mexico. **Troup** spoke of his role in F.C.'s murder and stated Garcia gave the order to kill F.C. **Troup** admitted walking into F.C.'s cell, where DeLeon and others were waiting for F.C. Once F.C. was in his cell, **Troup** closed the cell door and guarded the door while DeLeon and others strangled F.C. **Troup**

stated F.C. was killed, because he allegedly been seen on an episode of "Cops" providing information to law enforcement.

21.     In summary, **Troup** conspired with other SNM members to murder F.C. and participated in F.C.'s murder at the direction and under the leadership of the SNM.  While incarcerated at the SNMCF, Gallegos and DeLeon strangled F.C. to death in his cell, while **Troup** served as a lookout and helped prevent F.C. from escaping his attackers by keeping his cell door closed.  Due to the close quarters of F.C.'s cell, which had only one way in and out . . . , F.C. was not able to fight off his assailants or escape while he was being strangled out of the view of correctional officers  . . . .  Furthermore, DeLeon held F.C.'s arm while Gallegos wrapped the string about his neck . . . .  By virtue of his membership in the SNM, **Troup** was ordered to participate in the murder by the SNM's leadership . . . .

PSR ¶¶ 14-21, at 9-11.  Additionally,

[a]t trial, Michael Jaramillo testified about the 2001 murder of F.C. regarding Troup's role in the offense.  According to Jaramillo, Troup was to keep everyone in the dayroom or inside of their individual rooms while the murder of F.C. was committed.  Jaramillo testified he observed Troup downstairs (page 23 of Jaramillo transcript), but also indicated Troup had been in the pod area watching the doors to the cells.  When questioned about Troup's participation in the murder, Jaramillo noted Troup did participate, as he kept lookout while the murder of F.C. occurred (page 174 of Jaramillo transcript).
. . . .

. . . Benjamin Clark provided testimony that he had several conversations with Troup, confirming the information provided during the trial and in the discovery material was accurate.  Benjamin Clark testified that, in 2004, he and Troup had a conversation about the 2001 murders of "Looney" and "Pancho" at the Southern New Mexico Correctional Facility.  According to Clark, Troup stated "I really didn't do nothing.  All I did was close the door.  I wasn't involved in it."  It should be noted, "Pancho" is identified as the victim F.C. (page 63 of Clark transcript).

Second Addendum at 1-2.

The Court's findings of fact on Sanchez' murder for this sentencing are as follows:

22.     On June 17, 2007, a correctional office (CO) at the SNMCF was conducting formal count when inmate F.S. was found unresponsive in the prone position with pale limbs and without a pulse.  Medical personnel arrived and noticed dried blood on F.S.'s mouth, nose, and pillowcase.

23.     NMSP investigators arrived on scene a learned a CO had an informal interview with F.S. when he arrived at the SNMCF on June 14, 2007.  During the interview, F.S. indicated there was a "hit" on him, and the CO informed the unit manager that F.S. would need to be moved for his safety.  The CO stated he was surprised when he returned to work two days later and discovered F.S. had not been moved, as this process typically happened immediately.

24.     On June 18, 2007, an autopsy was performed by the Office of Medical Investigator in Albuquerque, New Mexico.  The results of the autopsy led to the medical examiner's opinion that F.S. died of ligature strangulation.  The autopsy revealed an abrasion almost completely encircling F.S.'s neck with a slight downward cant on the right posterior neck.  The underlying neck muscles showed hemorrhage and bruising, and the cartilage of the neck showed fractures.  The manner of death was ruled a homicide.

25.     Security video footage showed that on June 16, 2007, four inmates entered **Troup's** cell, while F.S. walked toward his cell, which was nearby.  At that time, the security cameras were covered with wet paper towels and remained covered for approximately 15 minutes.

26.     Several other inmates were interviewed on June 16, 2007, and the following information was gleaned.  **Troup**; Javier Alonso, a.k.a. "Wineo"; and Raymond Rascon were responsible for F.S.'s murder.  Inmates reported they could hear gurgling noises consistent with someone being strangled coming from F.S.'s cell.  Shortly thereafter, **Troup** was seen exiting F.S.'s cell with something in his hand, which he slid under another inmate's door.  **Troup** instructed everyone involved in F.S.'s murder, "No snitching.  Chances are we will all be going away for a while, so take a plea if you get a chance."

27.     On July 5, 2007, the STIU officer completed his investigation of F.S.'s murder, citing information that was received and corroborated by more than one source.  The officer determined **Troup** was one of three inmates who entered F.S.'s

cell on June 16, 2007 and murder[ed] F.S. **Troup** also arranged F.S.'s body to appear as if F.S. was sleeping.

28.     On July 7, 2007, NMSP officers conducted interviews with several witnesses/suspects of F.S.'s murder. Specifically, the officers spoke with Ruben Hernandez and Kyle Dwyer, who provided the following information. Hernandez indicated his primary role in F.S.'s murder was to obscure the security camera lenses prior to the murder. He was given instructions by **Troup**, and although he initially refused, he became fearful for his life; therefore, he complied with **Troup's** "orders." On the evening of June 16, 2007, Hernandez was approached by **Troup** who ordered him to cover the lenses immediately. Hernandez stated he placed wet paper towels over the lenses and became the lookout for any prison staff who may enter the pod. Hernandez stated he heard F.S. struggling, gasping, and gurgling in his cell and observed Alonso arranging F.S.'s body in his bed. **Troup** later ordered Hernandez to rearrange F.S.[] in his bed during the night to give the impression F.S. had moved around at some point; however, Hernandez stated he did not do as instructed.

29.     Dwyer initially indicated he did not have any involvement in F.S.'s murder. However, he later recanted and stated when he was transferred from the Penitentiary of New Mexico (PNM) in Santa Fe to the SNMCF, he hand-delivered a manila envelope to SNM member Benjamin Clark, a.k.a. "Cyclone". According to Dwyer, the envelope contained court documentation verifying F.S. had cooperated with law enforcement., Dwyer stated he received the envelope from a CO, who received it from Joe Martinez, an inmate at the PNM. Dwyer believed Clark disseminated the information in the envelope to additional SNM members. A few days later, Clark gave the envelope back to Dwyer and stated everyone who needed to see it had seen it, and he instructed Dwyer to destroy the envelope, which Dwyer did. Dwyer indicated he was transferred back to the PNM shortly after F.S.'s murder and was on the bus with Alonso. Alonso showed Dwyer how he could position his arm to make his wrist turn pale while wearing restraints and stated that was how F.S.'s face looked when Alonso was strangling him.

30.     In late November 2012, a CI spoke to **Troup** while they were at a house in Albuquerque. During the conversation, **Troup** confessed he held F.S.'s legs while Alonso strangled him to death with a drawstring from a laundry bag. **Troup** stated he and Alonso disposed of the drawstring, took off their clothes, and tore up any evidence to hide their part in the murder.

31.    In summary, **Troup** conspired with other SNM gang members to murder
F.S. and participated in F.S.'s murder at the direction and under the leadership of
the SNM.  While incarcerated at the SNMCF, **Troup** held F.S.'s legs as Alonso
strangled F.S. to death in his cell, while Hernandez covered the security camera
lenses and served as a lookout.  Due to the close quarters of F.S.'s cell, which had
only one way in and out, F.S. was not able to fight off his assailants or escape while
he was being strangled out of the view of COs. . . . Furthermore, **Troup** held F.S.'s
legs while Alonso was strangling F.S. . . . .   By virtue of his membership in the
SNM, **Troup** was ordered to participate in the murder by SNM's leadership . . . .

PSR ¶¶ 22-31, at 11-12.  Additionally,

Clark testified he had a conversation with the defendant shortly after the murder of
F.S. in 2007 (page 56 of Clark transcript).  Clark testified that Troup and Javier
Alonso were ordered by two members of the SNM to kill F.S.  Troup informed
Clark that he and Alonso were told "Thy the F isn't it done  If this doesn't get done,
then we're going to go in there and do Fred Dawg, and then we're going to do you."
Based on this statement, Alonso and Troup made the decision to kill F.S.  Clark
testified that Troup indicated Alonso grabbed F.S., threw him to the floor, and put
a rope around his neck.  Troup admitted to falling on F.S.'s legs, while Alonso
slammed F.S.'s head into the floor while strangling him (page 56-57 of Clark
transcript).

Second Addendum at 2.

## PROCEDURAL BACKGROUND

The parties gave their closing statements and turned the case over to the jury for it to begin

deliberations on Tuesday, May 22, 2018.  See Trial Minutes at 53-54.  The jury returned its verdict

on Friday, May 25, 2018, finding Troup "guilty of violent crimes in aid of racketeering in the

murder of Frank Castillo, as charged in Count 1 of the Indictment," and "guilty of violent crimes

in aid of racketeering in the murder of Freddie Sanchez, as charged in Count 3 of the Indictment."

Verdict at 3 (dated May 25, 2018), filed May 25, 2018 (Doc. 2332). The Court set Troup's

sentencing for May 15, 2019. <u>See</u> Notice of Hearing as to Edward Troup, filed March 11, 2019

(Doc. 2584)(this is a text-only entry on the docket).

       **1.**       **<u>The PSR</u>.**

      In calculating Troup's Guidelines sentence, the USPO first notes that Troup "has not

clearly demonstrated acceptance of responsibility for the offense[s]." PSR ¶ 35, at 13. As to Count

1, the USPO determines that the underlying crime of the racketeering activity is murder, providing

a base offense level of 43. <u>See</u> PSR ¶ 37, at 13. The USPO also applies a 2-level adjustment for

a vulnerable victim, determining that Castillo's inability "to fight off his assailants or escape while

he was being strangled out of the view of correctional officers" means he was a vulnerable victim.

PSR ¶ 21, at 11. <u>See</u> <u>id.</u> ¶ 39, at 13. The USPO applies a 2-level adjustment for restraint of victim,

because DeLeon held Castillo's arm while Gallegos strangled Castillo. <u>See</u> PSR ¶ 21, at 11; <u>id.</u>

¶ 40, at 14. The USPO does not apply an adjustment for Troup's role in the murder, determining

that, "because his actions led to F.C.'s death, neither an aggravating nor a mitigating role

adjustment is warranted in this case." PSR ¶ 21, at 11. <u>See</u> <u>id.</u> ¶ 41, at 14. The USPO also does

not apply an adjustment for obstruction of justice, and calculates an adjusted offense level of 47

for Count 1. <u>See</u> PSR ¶¶ 42-43, at 14.

      As to Count 3, the USPO again determines that the underlying crime is murder, providing

a base offense level of 43. <u>See</u> PSR ¶ 44, at 14. The USPO adds 2 levels under the vulnerable

victim adjustment, determining that Sanchez' inability "to fight off his assailants or escape while he was being strangled out of the view of COs" means he was a vulnerable victim. PSR ¶ 31, at 12. See id. ¶ 46, at 14. The USPO also applied the 2-level adjustment for restraint of victim, because "**Troup** held F.S.'s legs while Alonso was strangling F.S." PSR ¶ 31, at 12. See id. ¶ 47, at 14. The USPO does not apply an adjustment for Troup's role in the murder, determining that, "because his actions led to F.S.'s death, neither an aggravating nor a mitigating role adjustment is warranted in this case." PSR ¶ 31, at 12. See id. ¶ 48, at 14. The USPO also does not apply an adjustment for obstruction of justice, and calculates an adjusted offense level of 47 for Count 3. See PSR ¶¶ 49-50, at 14.

The USPO calculates the combined offense level as 49. See PSR ¶ 54, at 15. Accordingly, the USPO determines that the total offense level is 43. See PSR ¶ 57, at 15 (citing U.S.S.G. ch. 5, pt. A n.2.). The USPO then provides Troup's criminal history, which the Court summarizes in the following table.

| Date of Arrest | Charge/Court | Guideline | Points |
|---|---|---|---|
| March 20, 1989 Age 17 | Residential Burglary; Larceny; Conspiracy 2nd Judicial District Court of Bernalillo County, Albuquerque, New Mexico | § 4A1.2(e)(3) | 0 |
| November 28, 1989 Age 18 | Harboring a Felon; Contributing to the Delinquency of a Minor 2nd Judicial District Court of Bernalillo County, Albuquerque, New Mexico | § 4A1.1(c) | 1 |
| April 25, 1990 Age 18 | Residential Burglary 2nd Judicial District Court of Bernalillo County, Albuquerque, New Mexico | § 4A1.1(a) | 3 |
| November 8, 1990 | Residential Burglary | § 4A1.1(a) | 3 |

| | | | |
|---|---|---|---|
| Age 19 | 2nd Judicial District Court of Bernalillo County, Albuquerque, New Mexico | | |
| November 28, 1993<br>Age 22 | Conspiracy to Commit Residential Burglary<br>13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.1(a) | 3 |
| August 21, 1996<br>Age 24 | Receiving Stolen Property (Over $250)<br>12th Judicial District Court of Otero County, Alamogordo, New Mexico | § 4A1.1(a) | 3 |
| March 14, 1997<br>Age 25 | Possession of a Firearm or Destructive Device by a Felon<br>4th Judicial District Court of San Miguel County, Las Vegas, New Mexico | § 4A1.1(a) | 3 |
| November 22, 2001<br>Age 30 | Receiving or Transferring a Stolen Vehicle (Possession); Reckless Driving<br>2nd Judicial District Court of Bernalillo County, Albuquerque, New Mexico | § 4A1.1(c) | 1 |
| December 26, 2001<br>Age 30 | Residential Burglary; Receiving or Transferring a Stolen Vehicle (Possession); Conspiracy to Commit Residential Burglary' Reckless Driving<br>2nd Judicial District Court of Bernalillo County, Albuquerque, New Mexico | § 4A1.1(a) | 3 |
| July 1, 2003<br>Age 31 | Residential Burglary<br>2nd Judicial District Court of Bernalillo County, Albuquerque, New Mexico | § 4A1.1(a) | 3 |

See PSR ¶¶ 59-68, at 15-21. The USPO notes that these convictions "result in a subtotal criminal history score of 23," but adds an additional 2 points, because Troup "committed the instant offense while under a criminal justice sentence." PSR ¶¶ 69-70, at 21. This calculation results in a criminal history score of 25, and a criminal history category of VI. See PSR ¶ 71, at 21. The total offense level of 43 and criminal history category of VI provides a Guidelines imprisonment term of life. See PSR ¶ 92, at 26.

##        2.        **The Objections.**

Troup moves to strike the PSR's paragraphs 6-13, 17-18, 20-21, 26-31, and 65, objecting to its Guidelines calculation and some of the PSR's facts.  See Objections at 1-11.  Troup also requests that the Court order that his Objections and the Motion be provided to the Bureau of Prison's Classification Office, so that it has a more complete picture of Troup when deciding where he will be housed.  See Objections at 11-12.  Troup's first Guidelines Objection goes to his base offense level, arguing that the underlying crime for his 18 U.S.C. § 1959(a)(1) convictions cannot be first-degree murder, because "the Court instructed the jury as to both first degree murder and second degree murder under New Mexico law," the jury "did not make a finding on first degree murder," and "second degree murder under New Mexico law is sufficiently broad that the most analogous offense under federal law is manslaughter."  Objections at 6.  The Court used a general verdict form, so Troup maintains that "it cannot be determined whether the jury voted to convict on first degree murder or second degree murder."  Objections at 7.  Accordingly, Troup asserts that the Court must assume "that the jury used the instruction relating to second degree murder," as otherwise the calculation "would require improper judicial fact finding."  Objections at 7 (citing United States v. Booker, 543 U.S. 220, 244 (2005)).  Troup posits that the United States "cannot have it both ways: The government cannot seek, and be given, the flexibility of having the jury consider both first and second degree murder -- and then argue, upon conviction, that the jury convicted on first degree murder where there is no evidence that this was actually the jury's

verdict." Objections at 7 (emphasis in original). Troup argues that the second-degree-murder instruction "was so loose and expansive that it could encompass manslaughter under federal law." Objections at 8. Troup compares the United States Court of Appeals for the Tenth Circuit's Pattern Jury Instructions' language with the Court's jury instruction, noting that the Pattern Jury Instructions define malice aforethought as "kill[ing] another person deliberately and intentionally, or to act with callous and wanton disregard for human life," Objections at 8 (quoting Tenth Circuit Pattern Jury Instructions Criminal § 2.52, at 165 (2018)), whereas the Court instructed the jury that Troup "knew [his] acts created a strong probability of death or great bodily harm," Objections at 8 (quoting Court's Final Jury Instructions (without citations) Instruction 31, at 47 (Doc. 2302)("Court's Instruction")). Troup compares the Court's Instruction with the Tenth Circuit Pattern Jury Instruction for gross negligence, which is "wanton or reckless disregard for human life," Tenth Circuit Pattern Jury Instructions Criminal § 2.53 cmt., at 172, and argues that, because the Court's Instruction required a mens rea of only knowledge, "the most analogous federal offense to that found by the jury is involuntary manslaughter," so the Court should calculate Troup's base offense level based on the underlying crime being involuntary manslaughter, which is 12. Objections at 9 (citing U.S.S.G. § 2A1.4).

Troup also objects to the 2-level adjustment that the USPO imposes under U.S.S.G. § 3A1.1(b)(1) for a vulnerable victim in both Counts 1 and 3, asserting that the adjustment is not applicable. See Objections at 9. Troup maintains that the PSR "does not explain why the

Vulnerable Victim adjustment would apply. There is nothing in this case to suggest that there was something that made the victims (themselves members of a violent gang) particularly susceptible to criminal conduct." Objections at 9. Troup likewise objects to the USPO's imposition of a 2-level adjustment under U.S.S.G. § 3A1.3 for physical restraint, arguing that the adjustment is inapplicable and inappropriate. See Objections at 10. Troup argues that, because Castillo and Sanchez were strangled to death, "[w]hatever physical restraint took place was part and parcel of the crime itself." Objections at 10.

Next, Troup disagrees with the USPO's conclusion that a mitigating role adjustment is not warranted. See Objections at 10. Troup notes that "the SNM was a powerful prison gang" when Castillo and Sanchez were killed, and that "[t]here was testimony about 'orders' coming from higher ups in the SNM." Objections at 10 (internal quotation marks for emphasis). Troup asserts that his "role in both homicides could only be described as minor, particularly when compared to the killers: Jaramillo (who was immunized) and Alonso." Objections at 10. Accordingly, Troup requests that the Court apply a 2-level reduction for his minor role under U.S.S.G. § 3B1.2(b).

Troup's final objection to the Guidelines calculation is to the USPO's calculation of his criminal history, noting that "[p]aragraphs 60 through 68 list property crimes dating back to 1989 when Mr. Troup was 18 years old." Objections at 10. Troup objects to the inclusion of his 1997 conviction for "Possession of a Firearm or Destructive Device by a Felon," PSR ¶ 65, at 19, "because the details of the offense could not be located," Objections at 10. Further, Troup asserts

that, although he "has amassed 25 criminal history points, his criminal history is substantially overrepresented" and he requests a downward departure to a criminal history category of V under U.S.S.G. § 4A1.3. Objections at 10-11. Accordingly, Troup calculates that -- with a base offense level of 12, no adjustment for vulnerable victim or physical restraint, a 2-level reduction for being a minor participant, and the 2-level multiple count adjustment -- his total offense level is 12, and with a criminal history category of V, his Guidelines range is 27-33 months. See Objections at 11.

Troup also objects to the USPO's recitation of some of the facts. See Objections at 2-6. First, Troup objects to the PSR's sentence: "The following information was obtained from discovery material contained in the Assistant United States Attorney's file gleaned from FBI's investigative reports." Objections at 2 (internal quotation marks omitted)(quoting PSR ¶ 6, at 8). Troup asserts that, "when there's been a trial, as here, it is inappropriate to use 'the Assistant United States Attorney's file' to define the offense conduct." Objections at 2 (quoting PSR ¶ 6, at 8). Troup argues that the Court can rely on only "the statements made by witnesses under oath at trial" "to formulate the offense conduct," but because of some of the witnesses' "questionable credibility," any information on which the Court relies "must have sufficient indicia of reliability to support its probable accuracy." Objections at 2 & n.1. Troup repeats this objection to the PSR's sentence: "The investigative material in this case is extensive, and for the purpose of being concise, the following summary captures conduct as it pertains solely to this defendant and his participation in the RICO Act case." Objections at 2.

Troup objects to the PSR's paragraph 17, which reflects Lawrence Torres' statement that he saw Troup removing a laundry bag string, and that he saw Gallegos and DeLeon leave Castillo's cell. See Objections at 3 (citing PSR ¶ 17, at 10). Troup maintains that, because Jaramillo testified that he used Castillo's laundry bag cord to strangle Castillo, Torres' statement "was an obvious fabrication designed to elevate Torres' potential usefulness as a witness" and that he "was simply making stuff up." Objections at 3. Further, Troup asserts that Jaramillo killed Castillo, so, "[i]f Torres had seen anyone leaving Frank Castillo's cell, it would have been Michael Jaramillo (the killer)," so "Torres' statement is a fabrication." Objections at 4. Troup also notes that Jaramillo testified "that the only role Troup had (if Jaramillo is to be believed on this), was to remain downstairs, and somehow or other, keep people in their cells." Objections at 4. Troup objects to paragraph 21 as "a terrible misstatement of the facts presented at trial," and asserts that the PSR "ignored and omitted the critical testimony of Michael Jaramillo." Objections at 5 (citing PSR ¶ 21, at 10-11).

Troup objects to paragraph 25, asserting that "[t]he inmates who entered Troup's cell were Brian Rascon, Raymond Rascon, Javier Alonso and Mr. Troup." Objections at 5 (citing PSR ¶ 25, at 11). Troup objects to the portion of paragraph 31, which states: "While incarcerated at the SNMCF, Troup held F.S.'s legs as Alonso strangled F.S. to death in his cell, while Hernandez covered the security camera lenses and served as a lookout." Objections at 5 (internal quotation marks omitted)(quoting PSR ¶ 31, at 12). Troup asserts that "Alonso acknowledged being the

killer and stated so during his testimony, under oath, both at the time that he entered his guilty plea and at trial," and that "Alonso jumped on Sanchez, slammed his head into the ground and choked Sanchez until he was dead[,]" which "only took a matter of seconds." Objections at 5. Troup argues that he "engaged in conduct that distracted Freddie Sanchez momentarily, allowing Javier Alonso to jump on Sanchez from behind." Objections at 6. Finally, Troup clarifies that, contrary to paragraph 84's statement that "Troup is not taking any type of psychotropic medications," Troup has been taking Prozac "since he was incarcerated on December 3, 2015." Objections at 11 (citing PSR ¶ 84, at 24).

**3.        The First Addendum.**

The USPO responds to Troup's Objections. See Addendum to the Presentence Report, filed May 6, 2019 (Doc. 2634)("First Addendum"). The USPO "maintains that the underlying crimes in Counts 1 and 3 is Murder; therefore, the base offense level is 43." First Addendum at 3. As to Troup's Objections to the vulnerable victim and restraint of victim adjustments, the USPO "maintains that the information contained in these paragraphs of the presentence report are accurate and the increases were appropriately applied." First Addendum at 3. The USPO notes that "[s]everal Circuits have found that the enhancement for vulnerable victim is warranted when there is an assault against incarcerated or detained individuals[,]" and reiterates that the attacks occurred outside the view of the correctional officers, inside "cells only having one entrance and exit," and that the victims were "not able to fight off [their] assailants or escape while being held

down and strangled by multiple individuals." First Addendum at 3. The USPO also asserts that the SNM ordered Troup to participate in the murders and his actions led to their deaths, so "[h]is role in the offense cannot be seen as mitigating; therefore, a two-level reduction is not appropriate in this case." First Addendum at 3. The USPO maintains that the information regarding Troup's felon-in-possession conviction to which he objects "has been verified; therefore, the presentence report will remain unchanged at this time." First Addendum at 3. The USPO also notes that Troup "has 25 criminal history points, which is almost double the amount of points needed to be placed into a criminal history category of VI," so "his criminal history category cannot be identified as over-represented." First Addendum at 3. Accordingly, the USPO "maintains the defendant's total offense level, criminal history category, and guideline imprisonment range were accurately calculated." First Addendum at 3.

Regarding Troup's Objections to the PSR's paragraphs 6, 13, 17, 21, and 31, the USPO "maintains the information contained in these paragraphs of the presentence report is accurate[,]" because "it was obtained directly from discovery material provided by the United States Attorney's Office." First Addendum at 2. The USPO also notes that this information provides the Court and the "parties with historical information about the Syndicato de Nuevo Mexico." First Addendum at 2. Further, as to paragraph 25, the USPO responds that "the names of the persons entering the defendant's cell are not necessary[,]" because "the conduct pertains solely to the defendant and his participation in the RICO Act case." First Addendum at 3. Accordingly, the USPO writes that

"the presentence report will remain unchanged at this time."  First Addendum at 3.  Finally, the USPO, "[b]y way of this addendum, paragraph 84 of the presentence report, is amended to note the defendant states he has been taking Prozac since December 3, 2015."  First Addendum at 3.

    **4.**        <u>**The Motion.**</u>

Troup filed his Motion on May 10, 2019, noting that he seeks a variance only if the Court agrees with the USPO's calculation of the Guidelines sentence, because Troup believes the USPO's calculation "is harsher than what is necessary to achieve the sentencing objectives of 18 U.S.C. § 3553(a)."  Motion¶ 2, at 1.  Troup requests that the Court focus on his history from May, 2012, to the present.  <u>See</u> Motion ¶ 3, at 2.  Troup first notes that he was a free man for about thirty-three months from his release from prison in May, 2012, until his indictment in this case in December, 2015 -- stating that he was incarcerated for about ten months during that time, because "of failed UAs due to his addiction issues."  Motion ¶ 4, at 2.  Troup asserts that, while he was free, "he was a contributing member of society" -- getting married, rescuing a dog, reconnecting with his family, and working "at a job he loved with an employer who valued him" -- which Troup maintains "demonstrate[s] that he had turned his life around and was rehabilitated."  Motion ¶ 5, at 2.  Troup states that "it was his addiction issues that lead him to make poor decisions which resulted in his first incarceration at age eighteen," and that, after being prescribed Suboxone and completing "his removal from heroin" while incarcerated at Otero County Detention Facility ("Otero County") during the pendency of this case, he has obtained sobriety.  Motion ¶ 6, at 2-3.

Troup notes that, during the past forty-one months of his incarceration, he "has not received a single incident report or single dirty UA,[3]" Motion ¶ 7, at 3, and asserts that, because Otero County did not write up any reports of Troup's alleged threats against informants, those allegations "are frivolous," Motion ¶ 8, at 3. Troup admits that he "was not 'perfect' during the past seven years," but asserts that "it is remarkable how well [he] has done from the time he was released from the custody of the New Mexico Corrections Department in May, 2012, to the present." Motion ¶ 9, at 3. Troup notes that he was baptized while housed at the Torrance County Detention Facility on January 6, 2017, and that he "came into the world with many strikes against him," but that the past seven years "demonstrate that he has undergone significant rehabilitation and can be a contributing member of society." Motion ¶ 11, at 3. See id. ¶ 10, at 3.

Troup asserts that he has been punished for Sanchez' homicide, because he was moved to the PNM in 2007, after the murder, and the New Mexico Corrections Department removed five years of good time -- meaning Troup served "approximately five years' additional incarceration, most of which was served in harsh, solitary conditions." Motion ¶ 12, at 4. Troup notes that he will have his family's support upon his release, if his sentence is not too long. See Motion ¶ 13, at 4. Troup argues that, "to avoid unwarranted sentencing disparities," he "should not be sentenced more harshly than the actual killers simply because he exercised his Sixth Amendment right to a trial" and asserts that, if he were to receive a harsher sentence, the right to a jury trial would be

---

[3]UA stands for urinalysis, and a "dirty UA" refers to a failed urinalysis drug test.

"watered down if not outright undermined." Motion ¶ 14, at 4 (citing Jed S. Rakoff, Why Innocent People Plead Guilty, N.Y. Rev. of Books (Nov. 20, 2014), https://www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/). Troup posits that Jaramillo was more involved than Troup in killing Castillo and that the Rascon brothers were just involved as Troup in Sanchez' murder, but they were not charged. See Motion ¶ 15, at 5. Further, Troup asserts that "Eugene Martinez, Ruben Hernandez, Ben Clark, and Javier Alonso" were move involved or as involved in the killings, so Troup should not receive a higher sentence than any of these individuals. See Motion ¶ 15, at 5. Troup argues that "the Court should account for any possible disparities between the sentence recommended for Mr. Troup and the sentences to be imposed on Javier Alonso, Ben Clark and Ruben Hernandez." Motion ¶ 16, at 5-6.

Troup notes that he is now forty-seven-years old, the Castillo murder occurred eighteen years ago, the Sanchez murder occurred almost twelve years ago, and that recidivism rates decline as age increases. See Motion ¶ 17, at 6 (citing U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines 12 (2004), https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines). Troup asserts that the "warehousing of Mr. Troup is not necessary and is costly." Motion ¶ 18, at 6. Troup notes former-United States Attorney General Eric H. Holder, Jr.'s speech, which provides that "[t]oo many people go to too many prisons for far too long for no good law enforcement reason," and that "[w]e need to ensure that

incarceration is used to punish, to rehabilitate, and to deter -- and not simply to warehouse and forget."  Motion ¶ 18, at 6 (internal quotation marks omitted)(quoting Eric H. Holder, Jr., U.S. Att'y Gen., Dep't of Justice, Address at the 15th Annual National Action Network Convention (April 4, 2014)(transcript available at https://www.justice.gov/opa/speech/attorney-general-eric-holder-speaks-the15th-annual-national-action-network-convention).  Troup also notes the statement by the Honorable William Ray Price, Jr., former-Chief Justice of the Supreme Court of Missouri, urging the move "from anger-based sentencing that ignores cost and effectiveness to evidence-based sentencing that focuses on results -- [meaning] sentencing that assesses each offender's risk and then fits that offender with the cheapest and most effective rehabilitation that he or she needs."  Motion ¶ 19, at 6-7 (internal quotation marks omitted)(quoting Nat'l Ctr. for State Courts, Using Offender Risk and Needs Assessment Information at Sentencing: Guidance for Courts from a National Working Group 3 (2011), http://www.ncsc.org/~/media/Microsites/Files/CSI/RNA%20Guide%20 Final.ahx.  Troup asserts that, now, at age forty-seven, he "is prepared to be a productive member of society" and that it makes no sense to house him for life at $36,300.00 per year, because this drains taxpayers' money and it wastes "a man's life to incarcerate him for too long."  Motion ¶ 20, at 7.

Troup maintains that he was not involved in the 2015 incidents that spurred the investigation, and asserts that "[t]he SNM has been crushed" and is "a dying gang"; the investigation achieved its goal.  Motion ¶ 21, at 7.  See id. ¶ 22, at 7.  Troup argues that he has

already been incarcerated about nine years for the Indictment's Counts against him, including his loss of good time, and so he "is entitled to credit for time-served as of December 3, 2015." Motion ¶ 23, at 8. Troup underscores that, upon release, he "will serve a number of years on Supervised Release[,]" which will continue his punishment and help to guide him. Motion ¶ 24, at 8. Accordingly, Troup requests that the Court sentence him to the Guidelines range he calculated -- 27-33 months -- or for no more than 10-15 years. See Motion ¶ 25, at 8.

**5.    The First Addendum Response.**

Troup responded to the First Addendum on May 13, 2019. See Edward Troup's Response to the Addendum to Presentence Investigation Report (PSR) (DOC. 2634) at 1, filed May 13, 2019 (Doc. 2651)("First Addendum Response"). Troup notes his agreement with the USPO that the base offense level for his violations of 18 U.S.C. § 1959(a)(1) is calculated under U.S.S.G. § 2E1.3, which instructs that the base offense level is that of the underlying crime. See Frist Addendum Response at 10. Troup reiterates his belief that the applicable base offense level is that of involuntary manslaughter and notes that the USPO maintains her position "without explanation" that it is murder, but Troup contends that using murder as the underlying crime requires the Court "to engage in the sort of fact finding that is prohibited by *United States v. Booker*, 543 U.S. 220 (2005)." First Addendum Response at 10. Troup argues that there is no federal homicide offense which encompasses the mental state on which the Court instructed the jury, with the closest federal offense being involuntary manslaughter. See First Addendum Response at 11.

Troup also opposes the vulnerable-victim adjustment, and asserts that the USPO "offers scant justification" for the adjustment, does not quote or cite any cases, and does not provide facts to support the adjustment. First Addendum Response at 1-2. Troup notes that no United States Court of Appeals has held that an assault on an inmate by another automatically triggers the adjustment, which requires that the victim be "unusually vulnerable due to age, physical or mental condition, *or who is particularly susceptible to the criminal conduct*." First Addendum Response at 2 (emphasis in First Addendum Response)(internal quotation marks omitted)(quoting U.S.S.G. § 3A1.1(b) Application Note 2). Troup maintains that "there is no claim here that the victims were aged or suffered any physical or mental impairment," so "the enhancement can apply only if the inmate victims were 'particularly susceptible' to the underlying criminal conduct, homicide." First Addendum Response at 2 (quoting U.S.S.G. § 3A1.1(b) Application Note 2).

Troup argues that the cases applying "U.S.S.G. § 3A1.1(b) in a prison context often include a 'susceptibility' factor not present here: the defendant was a predatory correctional officer whose very power and position in the prison rendered the inmate victim particularly vulnerable to criminal conduct." First Addendum Response at 2. Troup first examines United States v. Hershkowitz, 968 F.2d 1503 (2d Cir. 1992), and asserts that the victim was not vulnerable only because of his status as an inmate, but because "he was 'in the custody of, and surrounded by, four guards when the assault occurred.'" First Addendum Response at 2 (quoting United States v. Hershkowitz, 968 F.2d at 1505). Troup also notes United States v. Lambright, 320 F.3d 517 (5th

- 29 -

Cir. 2003)(per curiam), in which, he asserts, the United States Court of Appeals for the Fifth Circuit applied the adjustment "largely because the inmate victim, attacked by a guard, 'was completely dependent upon the care of the correction officers.'" First Addendum Response at 3 (quoting United States v. Lambright, 320 F.3d at 518). Troup maintains that United States v. Pierre, 870 F.3d 845 (8th Cir. 2017), follows this same principle in applying the adjustment "where a prison guard exploited his position to steal inmates' identities and file fraudulent tax returns under their names, receiving refunds from the IRS as a result." First Addendum Response at 3 (citing United States v. Pierre, 870 F.3d at 849). Troup argues that "[t]his case differs substantially" from the caselaw, noting that he was an inmate and not a guard, and that he was only a lookout for Castillo's murder and a distraction for Sanchez' murder. First Addendum Response at 3.

Troup maintains that the Court must examine the totality of the circumstances, which "require[s] resolv[ing] disputed facts." First Addendum Response at 4. Troup notes Tenth Circuit precedent defining a "vulnerable victim" as "someone who is unable to protect himself or herself from criminal conduct, and is therefore in need of greater societal protection than the average citizen." First Addendum Response at 4 (internal quotation marks omitted)(quoting United States v. Shumway, 112 F.3d 1413, 1423 (10th Cir. 1997)). Troup asserts that the USPO's basis for the adjustment "highlight[s] circumstances that are true, tragically, of virtually all homicides committed by assailants in closed places[.]" First Addendum Response at 4. Accordingly, Troup argues that, "[i]f a lack of escape due to 'close quarters' and a homicide venue 'out of the view' of

authorities is enough to merit the vulnerable-victim enhancement, it's hard to imagine any homicide, especially a strangulation, unreachable by U.S.S.G. § 3A1.1(b)." First Addendum Response at 5 (quoting PSR ¶¶ 21, 31, at 11-12).

As to the physical-restraint adjustment, Troup argues that the facts as presented at trial do not support the adjustment, underscoring the USPO's misplaced reliance on the prosecutors' files. See First Addendum Response at 5-6. Troup asserts that, even if the USPO "can surmount factual barriers to U.S.S.G. § 3A1.3, [the USPO] will face a legal obstacle: double counting." First Addendum Response at 6. Troup notes the Sentencing Commission's "instructi[on to] district courts: Do not apply this adjustment where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself." First Addendum Response at 6 (emphasis added by First Addendum Response)(quoting U.S.S.G. § 3A1.3 Application Note 2). Troup argues that the Sentencing Commission's use of the disjunctive "or" shows the Sentencing Commission's intent to preclude the use of U.S.S.G. § 3A1.3 where "restraint constitutes an element of the offense" and "where the defendant's conduct intrinsically involves physical restraint." First Addendum Response at 6. Troup notes that the Court's understanding of U.S.S.G. § 3A1.3 clashes with the Sentencing Commission's intent, because the Court has "endorsed the position that physical restraint must be an actual element of the offense before the § 3A1.3 can be ruled out." First Addendum Response at 7. Troup posits that double counting occurs where "one part of the Guidelines is applied to increase a

defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines."  First Addendum Response at 7 (internal quotation marks omitted)(quoting United States v. Alexander, 48 F.3d 1477, 1492 (9th Cir. 1995)).  Troup contends that "the base offense level rests on and incorporates the fundamental criminal conduct in which Mr. Troup engaged[,]" specifically, murder by strangulation, which Troup maintains "is conduct that amounts to the physical restraint of the victim."  First Addendum Response at 7.  Troup allows that strangulation is "a brutal if intimate form of killing, and it compels conduct that amounts to the physical restraint of the victim" and necessitates physical restraint for asphyxia to occur.  First Addendum Response at 7.

Troup further maintains that "he satisfies the guideline definition of 'minor' participant because he 'is less culpable than most other participants in the criminal activity.'"  First Addendum Response at 8 (quoting U.S.S.G. § 3B1.2 Application Note 5).  Troup notes that the USPO acknowledges that "Troup 'was ordered to participate in the murder by the SNM's leadership,'" but does not conclude that Troup is entitled to a reduction, because, as Troup asserts, the USPO relied on "materials never presented to the jury" to obtain her facts.  First Addendum Response at 8 (quoting First Addendum at 3).  Because the applicability of a role adjustment depends on the case's particular facts, Troup argues that the Court should rely on trial evidence for the facts and "not the dubious assertions relied on by the PSR."  First Addendum Response at 8.  Troup contends that the trial evidence reveals that gang leaders compelled Troup's involvement in the criminal

activity, instructing him to serve as the lookout during Castillo's murder and to distract Sanchez while Alonso killed him. See First Addendum Response at 8-9. Troup asserts that he served a minor role in relation to other SNM members, especially the murderers Jaramillo and Alonso, and, thus, should receive a 2-level reduction. See First Addendum Response at 9.

Troup reiterates his request for a 1-level departure to criminal history category V, alleging that such a departure is warranted "if the criminal history category substantially over-represents either (1) 'the seriousness of the defendant's criminal history' or (2) 'the likelihood that the defendant will commit other crimes.'" First Addendum Response at 9 (quoting U.S.S.G. § 4A1.3(b)(1)). Troup notes that "[s]even of his criminal history points were accumulated in an eleven-month period when [he] was only 18-19 years old" and that these convictions "took place so long ago that it is overstating [his] Criminal History to rely on such dated convictions." First Addendum Response at 9 (citing PSR ¶¶ 60-62, at 16-18). Troup maintains that these offenses were not violent. See Addendum Response at 9. Accordingly, Troup requests that the Court: (i) conclude that the applicable base offense level is that of involuntary manslaughter, 12; (ii) decline to apply the 2-level adjustments for vulnerable victim or restraint of victim; (iii) apply a 2-level reduction, because Troup was a minor participant; and (iv) apply a downward departure to criminal history category V, producing a Guidelines range of 27-33 months.

6.	**The Second Addendum.**

The USPO filed the Second Addendum on May 14, 2019, to elaborate on her responses to the Objections and to respond to the First Addendum Response.  See Second Addendum to the Presentence Report at 1, filed May 14, 2019 (Doc. 2654)("Second Addendum").  The USPO provides that 18 U.S.C. § 1959(a)(1)'s applicable Guideline is U.S.S.G. § 2E1.3, which provides that "the base offense level shall be the greater of : 1) 12; or 2) the offense level applicable to the underlying crime or racketeering activity."  Second Addendum at 2.  The USPO states that Troup "was charged with and found guilty by a jury of his peers of Violent Crimes in Aid of Racketeering (Murder) and Aiding and Abetting," which contain a statutory sentence of life imprisonment. Second Addendum at 2.  The USPO reiterates that "the underlying crime is murder; therefore, the base offense level for Murder (U.S.S.G. § 2A1.1), which is 43, was correctly applied."  Second Addendum at 2.

The USPO also stands by the application of the vulnerable victim adjustment, stating, "as supported by circuit case law, U.S. v. Tapia (59 F.3d 1137), the Eleventh Circuit District Court found that the victim was 'particularly vulnerable by virtue of his incarceration with [a]ppellants and his inability to escape, and that [the victim] was targeted because of his vulnerability.'" Second Addendum at 2 (alterations added to correct the quote)(quoting United States v. Tapia, 59 F.3d 1137, 1143 (11th Cir. 1995)).  The USPO also cites United States v. Lambright, providing that "the District Court based its conclusion that the victim was vulnerable 'on the findings that he

- 34 -

was completely dependent upon the care of the correction officers, that he was locked in his cell prior to the assault, and that he could not protect himself from the assault.'" Second Addendum at 2 (quoting United States v. Lambright, 320 F.3d at 518). With this caselaw, the USPO states that "the presentence report will remain unchanged at this time." Second Addendum at 2.

The USPO asserts that the restraint-of-victim adjustment is accurately applied, because Troup served as the lookout during Castillo's murder and helped prevent Castillo from leaving, and because Troup held Sanchez' legs as Alonso strangled him. See Second Addendum at 3. The USPO provides that a reduction under U.S.S.G. § 3B1.2(b) for being a minor participant does not apply to either murder, because, through Troup's "membership in the SNM," Troup's "actions assisted in and led to the death of both F.C. in 2001 and F.S. in 2007." Second Addendum at 3. The USPO also notes that Troup suggested strangling Sanchez and offered to take over the strangulation from Alonso. See Second Addendum at 3. The USPO asserts that Troup's criminal history category is not over-representative, noting that, while "his criminal history dates to 1989, he continually committed crimes for 15 years, including during his periods of incarceration," so a departure is not warranted. Second Addendum at 3.

The USPO "maintains the presentence report offense conduct and information therein is accurate, as determined by relevant conduct and trial transcripts from SNM members during the Edward Troup trial." Second Addendum at 1. The USPO cites first to Jaramillo's testimony, noting that Jaramillo provided that "Troup was to keep everyone in the dayroom or inside of their

individual rooms while" Jaramillo killed Castillo, and "also indicated Troup had been in the pod area watching the doors to the cells." Second Addendum at 1 (citing Excerpted Testimony of Michael Jaramillo at 23:2-8 (taken May 14, 2018)(Beck, Jaramillo), filed May 23, 2018 (Doc. 2316)("Jaramillo Tr.")). The USPO underscores that Jaramillo stated that Troup participated in the murder by serving as a lookout during the murder. See Second Addendum at 1 (citing Jaramillo Tr. at 174:7-11 (Beck, Jaramillo)).

The USPO cites Alonso's testimony, in which Alonso discussed meeting with Troup and two others to plan Sanchez' hit, and stated that Troup suggested that they strangle Sanchez. See Second Addendum at 2 (citing Transcript of Excerpted Testimony of Javier Alonso at 37:15-38:13 (taken May 7, 2018)(Beck, Alonso), filed May 23, 2018 (Doc. 2310)("Alonso Tr.")). The USPO provides that Alonso said that he entered Sanchez' cell with Troup, that Troup held Sanchez' legs while Alonso strangled Sanchez, and that, at some point during the strangulation, Troup asked Alonso if he wanted Troup to take over. See Second Addendum at 2 (citing Alonso Tr. at 44:5-6 (Alonso)). The USPO also cites Clark's testimony, in which Clark said that he had a conversation with Troup in 2004 in which Troup stated that he closed Castillo's cell door during the murders of "Looney" and "Pancho" at Southern New Mexico Correctional Facility. See Second Addendum at 2 (citing Transcript of Excerpted Testimony of Benjamin Clark at 63:1-12 (taken May 4, 2018)(Beck, Clark), filed May 23, 2018 (Doc. 2307)("Clark Tr.")). According to the USPO, Clark testified that he spoke with Troup shortly after Sanchez' murder in 2007, and that Troup indicated

that if he did not kill Sanchez he would be killed instead, and that Troup fell on Sanchez' legs as Alonso strangled him.  See Second Addendum at 2 (citing Clark Tr. at 56:11-57:25 (Beck, Clark)).

7.     **The Second Addendum Response.**

Troup responded to the Second Addendum on May 14, 2019.  See Edward Troup's Partial Response to the Second Addendum to Presentence Investigation Report (PSR) (Doc. 2654) at 1, filed May 14, 2019 (Doc. 2655)("Second Addendum Response").  Troup agrees with the USPO that U.S.S.G. § 2E1.3 applies and that the underlying crime is murder, but asserts that the USPO errs "in assuming that the base offense level for federal murder, 43, is correct."  Second Addendum Response ¶ 5, at 2.  Troup asserts that the underlying crime is "New Mexico murder" and reiterates his belief that "the most analogous federal offense is involuntary manslaughter."  Second Addendum Response ¶ 5, at 2 (citing U.S.S.G. § 2E1.3 Application Note 1).  Troup also argues that, because the Court instructed the jury "on New Mexico Murder and not generic murder, . . . the convictions in this case do not meet the definition of VICAR murder, and a life sentence is not required by 18 U.S.C. § 1959(a)(1)."  Second Addendum Response ¶ 6, at 2 (citing Edward Troup's Reply in Support of His Motion for New Trial at 8-12, filed December 14, 2018 (Doc. 2466)).  Troup underscores that the jury instruction on second-degree murder under New Mexico law "is far broader than either federal murder or generic murder[,]" which he asserts precludes the application of U.S.S.G. § 2A1.1's base offense level of 43 or 18 U.S.C. § 1959(a)(1)'s mandatory life sentence.  Second Addendum Response ¶ 7, at 2.  Troup concludes

by stating that an oral response "to other inaccurate statements" in the Second Addendum would be given at the sentencing hearing. Second Addendum Response ¶ 8, at 2.

### 8.    The United States' Response.

The United States responded to the Objections and the Motion in the same document, on May 14, 2019. See United States' Response to Defendant Edward Troup's Objections to the Presentence Investigation Report (Doc. 2621) and to Edward Troup's Conditional Motion for Downward Variance (Doc. 2648) at 1, filed May 14, 2019 (Doc. 2656)("United States' Response"). The United States asserts "that there are no grounds for sustaining the defendant's objections," and that "a downward departure or variance is not authorized by law." United States' Response at 1. The United States maintains that the USPO correctly uses the base offense level for murder and that Troup's conduct is nowhere near that of involuntary manslaughter as he alleges. See United States' Response at 4. The United States provides involuntary manslaughter's elements:

> "The elements of involuntary manslaughter are as follows: (i) the unlawful killing: (ii) of a human being; (iii) without malice; (iv) through either: (a) the commission of an unlawful act not amounting to a felony; or (b) while committing a lawful act in an unlawful manner, with or without due caution and circumspection, which act might produce death. *See* 18 U.S.C. § 1112(a); Tenth Circuit Pattern Jury Instructions Criminal § 2.54.1, at 184 (2011) (Involuntary Manslaughter). When the killing occurs outside of a situation involving the commission of an unlawful act not amount to a felony, the United States must prove to secure a conviction under 18 U.S.C. § 1112(a) for involuntary manslaughter that defendant acted with 'gross negligence amounting to wanton and reckless disregard for human life.' Tenth Circuit Pattern Jury Instructions Criminal § 2.54.1, at 185.

United States' Response at 4 (quoting <u>United States v. Ganadonegro</u>, 854 F. Supp. 2d 1068, 1082-83 (D.N.M. 2012)(Browning, J.)).  The United States maintains that Troup's "conduct clearly demonstrates the guideline calculations are correct and that involuntary manslaughter is not the proper underlying crime forming the basis of the calculations."  United States' Response at 4.  The United States notes that Leonard Lujan told Troup not to participate in Castillo's murder, but he did anyways, and "aided in the success of the murder by serving as a lookout and securing the door while others strangled Castillo to death."  United States' Response at 5.  As to Sanchez' murder, the United States maintains that Troup "participated in the Sanchez murder, including by physically restraining him."  United States' Response at 4.  Accordingly, the United States posits that Troup's "participation in both murders justifies the PSR guideline calculations."  United States' Response at 5.

The United States agrees with the USPO's imposition of the vulnerable victim adjustment and requests that the Court overrule this objection.  <u>See</u> United States' Response at 5.  The United States also agrees with the USPO's conclusion that Troup is not entitled to a mitigating role reduction, noting that Troup bears the burden of establishing his entitlement to this reduction, and requests that the Court overrule this Objection.  <u>See</u> United States' Response at 5.  The United States contends that "[a] downward departure may be warranted if 'reliable information indicates that the defendant's criminal history category *substantially over-represents* the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes.'"

United States' Response at 5 (emphasis added by United States' Response)(quoting U.S.S.G. § 4A1.3(b)(1)). The United States notes an example the Guidelines provide: "[a] downward departure under this guideline 'may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense *and no other evidence* of prior criminal behavior in the intervening period.'" United States' Response at 5-6 (emphasis added by United States Response)(quoting U.S.S.G. § 4A1.3 Application Note 3). The United States maintains that "[t]here is no reliable information whatsoever to establish that the defendant's criminal history category is substantially over-represented," especially because Troup "committed two murders while in custody," so the United States requests that the Court overrule this Objection. United States' Response at 6.

The United States requests that the Court overrule Troup's objection to the USPO's use of the prosecutors' files, "because the information obtained from the discovery in this case was accurate [and] because this same information was presented at length during trial." United States' Response at 1. The United States contends that the PSR's paragraphs 6-13 are relevant, because they describe the SNM gang and its actions, and the United States had to prove at trial the existence of the SNM enterprise and Troup's membership with the SNM. See United States' Response at 2. The United States also highlights that, while "it is a good practice to include information from trial in a PSR, the Court 'may consider, without limitation, any information concerning the background,

character and conduct of the defendant, unless prohibited by law.'" United States' Response at 2 (quoting U.S.S.G. § 1B1.4; and citing 18 U.S.C. § 3661).

As to Troup's Objection to paragraph 17, the United States provides excerpts from trial testimony to support the PSR's facts. See United States' Response at 2. The United States provides that Torres testified that Troup told Torres to go back downstairs, and that he saw Troup and DeLeon take apart a laundry bag. See United States' Response at 2 (citing Transcript of Excerpt of Testimony of Lawrence Torres at 30:9-25 (taken April 24-25, 2018)(Armijo, Torres), filed May 16, 2018 (Doc. 2283)("Torres Tr.")). The United States notes Jaramillo's testimony that Gallegos assigned the roles for Castillo's murder, including Troup's role to keep the non-participating inmates in their cells or the dayroom. See United States' Response at 2 (citing Jaramillo Tr. at 15:1-17:1 (Beck, Jaramillo)). According to the United States, Jaramillo described entering Castillo's cell with Gallegos and DeLeon, Castillo injecting himself with heroin, and Gallegos and DeLeon grabbing Castillo as Jaramillo began choking him. See United States' Response at 2-3 (citing Jaramillo Tr. at 19:17-22 (Jaramillo)). As to paragraph 21, the United States requests that the Court also overrule this Objection, arguing that "Castillo was a vulnerable victim[,]" because "[h]e was attacked immediately following an injection of heroin into his system and overpowered and killed by three people." United States' Response at 3. The United States also posits that "[t]here is no doubt that Castillo was restrained, so it is not accurate to allege that

this paragraph 'is affirmatively misleading.'"  United States' Response at 3 (quoting Objections at 5).

The United States argues that Troup's Objections to the Sanchez' murder offense conduct and Guidelines calculations "are the flimsiest of his arguments."  United States' Response at 3. The United States notes issues with Troup's Objection to the statement that he held Sanchez' legs during the murder in which Troup alleges that Alonso is Sanchez' killer, first asserting that "the law does not distinguish between 'real' or 'actual' murders and those who aid and abet those offenders."  United States' Response at 3 (internal quotation marks for emphasis and not for quotation).  Second, the United States provides that Troup does not provide any quotes from the record, which the United States contends "clearly establishes that the defendant played an active role in Sanchez' murder."  United States' Response at 4.  The United States notes Alonso's testimony that Troup held Sanchez' lower body while Alonso strangled him and that Troup offered to take over when Alonso said his hands hurt.  <u>See</u> United States' Response at 4 (citing Alonso Tr. at 43:15-44:6 (Beck, Alonso)).

Finally, the United States requests that the Court deny Troup's Motion.  <u>See</u> United States' Response at 6.  The United States notes that Troup's conviction requires a mandatory penalty of life imprisonment, so "the Court is not authorized to grant either a departure under the sentencing guidelines or a variance pursuant to 18 U.S.C. § 3553(a)."  United States' Response at 6 (citing 18 U.S.C. § 1959(a)(1)).  Accordingly, the United States requests that the Court overrule all of

Troup's Objections, deny the Motion, and impose a life sentence for each VICAR conviction. <u>See</u> United States' Response at 6.

9. **The Hearing.**

The Court sentenced Troup on May 15, 2019. <u>See</u> Tr. at 3:19-20. The Court began by inquiring whether Troup had reviewed the PSR, the First Addendum, and the Second Addendum, and Troup answered affirmatively. <u>See</u> Tr. at 5:15-21 (Court, Troup). Troup requested that the Court provide its inclinations on the Objections before Troup makes his argument on them. <u>See</u> Tr. at 5:12-14 (Burke). The Court first provided its inclination to overrule Troup's Objection to the base offense level, indicating that the Court's decision that the underlying crime is murder does not constitute improper judicial factfinding and that, because a preponderance of the evidence establishes that Troup participated in a premeditated killing of both Castillo and Sanchez with malice aforethought, the most analogous offense is first-degree murder, producing a base offense level of 43. <u>See</u> Tr. at 5:13-14:3 (Court). Troup responded that he believes the Court's engaging in factfinding to determine the base offense level "usurped the authority and the power of the jury." Tr. at 13:13-14 (Burke). <u>See</u> <u>id.</u> at 13:6-14 (Burke). Troup underscored that the Court gave the jury a second-degree-murder instruction, over Troup's objection, and that now, "in effect, an instruction on second degree which allowed substantial injury, which is not even close [to] an analog of murder[,] is now being used to get to a sentence of first [degree] murder." Tr. at 13:22-25 (Burke). The United States indicated that it would defend the Court's position on appeal and

contended that the Court properly engaged in factfinding, noting that the Court may make findings up to the statutory maximum here of life -- which is what the Court did.  See Tr. at 14:18-36 (Castellano).  The United States stated that Troup's analysis was flawed, because of Troup's belief that he did not restrain Sanchez -- in contravention of Alonso's trial testimony that Troup held Sanchez' lower body -- and argued that such restraint points to finding first-degree murder.  See Tr. at 15:6-15 (Castellano).  The United States notes that Troup was aware of Castillo's murder before it occurred and became involved in the murder after Lujan told him not to participate.  See Tr. at 15:15-22 (Castellano).

Troup also wanted to hear the Court's thoughts on the vulnerable victim adjustment before providing his argument.  See Tr. at 16:24-25 (Burke).  The Court indicated its inclination to overrule the Objections to the vulnerable victim adjustment, determining that both victims were particularly susceptible to being murdered, because they had cooperated with law enforcement, had outstanding greenlights on them by SNM members, and were incarcerated with SNM members.  See Tr. at 17:1-20:20 (Court).  Troup underscored that, in United States v. Tapia, the victim "was targeted because he was vulnerable," but, here, the victims were targeted because they were informants, not because they were vulnerable.  Tr. at 21:9-10 (Burke).  See id. at 21:6-19 (Burke).  Troup provided that it "is an important factual matter" in United States v. Tapia that "the victim was targeted because he was vulnerable."  Tr. at 21:25-22:2 (Burke).  The United States noted that Castillo's murderers "caught him early in the morning in his cell and they strangled him

immediately following his heroin injection," which added to his vulnerability. Tr. at 22:14-16 (Castellano). See id. at 22:16-21 (Castellano). Troup underscored that he was not in Castillo's cell during the murder and that he has a right "to have individualized sentencing," so "this smearing and spreading over Mr. Troup all the other actions of other people is inappropriate in individualized sentencing." Tr. at 23:3-6 (Burke). See id. at 22:24-23:2 (Burke). Troup questioned whether the Court credited Torres' testimony in its analysis, and, when the Court answered affirmatively, Troup underscored that Torres' and Jaramillo's testimonies contradict each other, so one must have lied, and that Torres' demeanor "on the stand was incredible almost per se." Tr. at 24:14-15 (Burke). See id. at 23:17-24:15 (Burke, Court). The Court indicated that it does not believe that it needs to resolve the inconsistency between Torres' and Jaramillo's testimonies to credit Torres. See Tr. at 24:25-4 (Court). Troup emphasized that he "believe[s] that they both can't be telling the truth." Tr. at 25:12 (Burke). The United States proffered its belief that the testimonies do not have to be mutually exclusive, because Jaramillo cannot testify to where Torres saw Troup while Jaramillo was inside Castillo's cell, so "one does not have to be true to prove the other one false[,]" and Troup told Clark that he closed Castillo's cell door. Tr. at 25:18-20 (Castellano). See id. at 25:14-25 (Castellano). Troup reiterated his belief that the testimonies have to be mutually exclusive -- that it is not physically possible for Torres and Jaramillo both to be telling the truth -- and wanted the record to reflect this belief. See Tr. at 26:1-13 (Burke).

Troup then asked the Court to provide its thoughts on the restraint-of-victim adjustment before he argued. See Tr. at 26:20-24 (Court, Burke). The Court provided its inclination to overrule Troup's Objections to the restraint-of-victim adjustment, determining that there was additional physical restraint of the victims apart from the act of strangulation itself so there is no impermissible double-counting. See Tr. at 26:25-29:5 (Court). Troup argued that the Court's view is too broad and that double-counting focuses on harmful conduct, rather than elements. See Tr. at 29:6-15 (Burke). Troup underscored that "such harmful conduct can be embodied by another part of [the] guidelines" and that asphyxia only occurs with some act of restraint, so applying the adjustment is prohibited double-counting, because "the base offense level is the same conduct that this upward adjustment is now being rested upon." Tr. at 29:15-16, 22-24 (Burke). See id. at 29:17-25 (Burke). Troup noted the handwritten note attached to the First Addendum Response, which states that Alonso slammed "Sanchez's head down while choking him. Troup in background unknown what he was doing because [Alonso] facing away." Tr. at 30:17-20 (Burke)(citing Note at 1 (undated), filed May 13, 2019 (Doc. 2651-7)). Troup asserted that Alonso strangled Sanchez and did not know what Troup was doing, and that, according to Dr. Zumwalt, Alonso asphyxiated Sanchez within approximately six seconds. See Tr. at 31:1-8 (Burke). Troup asserted that it was likely that it was B. Rascon was in Sanchez' cell with Alonso during the murder, because of the red marks on B. Rascon's back, and that, because "the Rascon brothers were given a pass and they weren't selected as the defendants in this particular count, Mr. Troup

- 46 -

was selected, so Javier Alonso know who he had to say was involved." Tr. at 31:14-17 (Burke). See id. at 31:10-14 (Burke)(citing Photographs at 1-2 (undated), filed May 13, 2019 (Doc. 2651-6)). Troup highlighted Alonso's trial testimony in which Alonso stated that he jumped on Sanchez and strangled him to death. See Tr. at 32:6-9 (Burke)(citing Alonso Tr. at 128:18-21 (Burke, Alonso). Troup contended that the evidence is on his side when he asserts that he did not physically restrain Sanchez and that, regarding Castillo's murder, Troup was not "involved in the actual killing[,]" because he was serving as the lookout and keeping other inmates in their cells. Tr. at 32:24 (Burke). See id. at 32:10-33:5 (Burke). Troup underscored that he is supposed to have an individualized sentencing. See Tr. at 32:25 (Burke). The United States responded that the Court had covered the United States' views on the physical restraint adjustment, and noted that Troup presented the rough notes and not the full 302 report, precluding the Court from having the entire picture on that debriefing. See Tr. at 33:11-14 (Castellano). The United States also noted that Troup highlighted Alonso's recross testimony, where Troup asked Alonso only what he did, so Troup's actions are "absent from the record[,]" although Alonso indicated on direct that Troup aided Alonso in strangling Sanchez. Tr. at 33:19 (Castellano). See id. at 33:15-23 (Castellano).

Troup then argued for a mitigating-role adjustment, noting the factual disagreement, and his belief that neither Jaramillo nor Torres told the truth. See Tr. at 34:15-22 (Burke). Troup noted that his role during Castillo's murder "was to prevent witnesses in an SNM pod" and that the law requires the Court to compare this role to the roles of others within the entire SNM in determining

whether a role adjustment is proper. Tr. at 34:23 (Burke). <u>See</u> <u>id.</u> at 34:22-35:2 (Burke). Troup asserted that the New Mexico Corrections Department was primarily responsible for Sanchez' murder, because it knew that there was a hit out on Sanchez and did not move him, which allowed Sanchez to be killed. <u>See</u> Tr. at 35:3-8 (Burke). Troup argued that Clark was the next most responsible for Sanchez' murder, by ordering Sanchez killed, and that even the people in the neighboring pod had a higher role than Troup, because they threatened to kill Alonso if he did not act on Sanchez' outstanding hit. <u>See</u> Tr. at 35:8-15 (Burke). Troup argued that the SNM's leaders such as Clark "had an iron grip on the actions of other gang members in 2007," so it would be wrong to say that Troup did not play a minor role in both Castillo's and Sanchez' murders. Tr. at 35:18-19 (Burke). <u>See</u> <u>id.</u> at 35:16-24 (Burke). The United States responded, noting that Troup bears the burden to establish a mitigating role. <u>See</u> Tr. at 36:3-5 (Castellano). The United States asserted that Troup served an important role as a lookout during Castillo's murder, because "[i]t was important to make sure that no one else got involved and he did that." Tr. at 36:9-11 (Castellano). <u>See</u> <u>id.</u> at 36:7-9 (Castellano). The United States contended that Troup "suggested strangulation as the means of committing the [Sanchez] murder which he knew was successful from 2001" and took initiative to carry out the hit. Tr. at 36:11-13 (Castellano). <u>See</u> <u>id.</u> at 36:13-15 (Castellano). Accordingly, the United States did not believe that Troup met his burden. <u>See</u> Tr. at 36:15-17 (Castellano).

Troup then argued for a downward departure on his criminal history, noting that he began to offend as a teenager because of his heroin addiction. See Tr. at 38:1-6 (Burke). Troup noted that his last felony conviction occurred when he was thirty-one, and he is now forty-six and that the Guidelines allow Courts to consider overrepresentation. See Tr. at 38:6-12 (Burke). Troup underscored that his criminal history "from 2007 has been remarkable" and that he "believe[s] that he has shown through his behavior that the likelihood of future crimes is very, very small." Tr. at 38:15-17 (Burke). Troup posited that the Guidelines' language grants the Court discretion to find overrepresentation. See Tr. at 38:18-39:1 (Burke). The United States responded that, until the jury convicted Troup in this case, his criminal history did not show the murders that Troup had committed in his past and that Troup's situation is dissimilar to the Guidelines' example. See Tr. at 39:8-14 (Castellano).

Troup requested time "to make an additional record on the base offense level," Tr. at 41:6-7 (Burke), and asserted that, "under the instruction, instruction 31[,] . . . a jury could have convicted Mr. Troup of the VICAR counts if" he acts as a "principal" and if "his actions . . . created a strong probability of great bodily harm[,]" Tr. at 41:13-18 (Burke), but that "[t]here is no federal homicide that is corresponding to that[,]" Tr. at 41:19-20 (Burke). Troup admitted that involuntary manslaughter also does not directly correspond with the Court's Instruction 31, but stated that he "went down[,] which [he] believe[s] the law requires when there is no jury finding rather than going back up." Tr. at 41:22-24 (Burke). See id. at 41:20-22 (Burke). Troup insisted that, had

the Court instructed the jury on misprision and had the jury "rejected misprision[,] that would have been more information [about] what the jury was thinking." Tr. at 42:8-9 (Burke). See id. at 42:2-12 (Burke). Troup contended that generic murder requires malignant, reckless, and wanton disregard for human life, and that the Court's Instruction 31 was too broad to support a determination that the jury found that Troup acted with such mens rea. See Tr. at 42:13-16 (Burke). The United States clarified that it submitted both first- and second-degree murder instructions, because it "believed that those did meet [the] definition of murder" and reiterated that "both of them do have a malice requirement." Tr. at 42:25-43:2 (Castellano). Troup noted that the Court's Instruction 31 "talks about strong probability of injury" and does not discuss malice aforethought, which is necessary "to be murder." Tr. at 43:6-7, 9 (Burke). See id. at 43:5-10 (Burke). The United States suggested looking at New Mexico caselaw regarding second-degree murder's malice requirement. See Tr. at 43:15-17 (Castellano). The Court responded that it needs to look at federal first-degree murder's elements and determine, based on a preponderance of the evidence presented at trial, whether Troup satisfied those elements to apply the base offense level the USPO recommends; the jury convicted Troup of a crime, which is different from the Court's job at sentencing. See Tr. at 44:2-17 (Court).

The Court stated that Troup's "offense level is 43, and the criminal history category is 6 and the guideline imprisonment term is life[,]" but noted that there is also a statutory sentence. Tr. at 44:21-23 (Court). See id. at 44:24-25 (Court). The Court provided that it was prepared to go

through Troup's factual Objections, but inquired whether the Court's "request to probation to go through the [trial] transcript . . . resolve[d] any or all of the factual objections." Tr. at 45:6-8 (Court). See id. at 45:1-9 (Court). Troup responded that he had "much more confidence in reading that transcripts were reviewed, because [he] think[s] that reading the prosecutors['] files in a case that went to trial is just inappropriate." Tr. at 45:14-17 (Burke). Troup underscored that his real concern is that the PSR gets sent to the Bureau of Prison's Classification Office and that he "want[s] there to be balance so when the classifications people see the paperwork that comes with [him] that they get a [f]uller view of him[.]" Tr. at 45:21-24 (Burke). See id. at 45:10-20 (Burke). The Court proposed overruling the factual Objections in light of the Second Addendum's reliance on the trial transcripts and ordering the USPO to send to the Bureau of Prison's Classification Office whatever Troup wants sent. See Tr. at 46:2-18 (Court). Troup responded that the "concept does work, Your Honor," and requested a dialogue with the USPO to narrow the issues and create a balanced package to send to the Bureau of Prison's Classification Office, including such things as Jerry Roark's white paper describing the SNM as a dying gang.[4] Tr. at 46:19-20 (Burke). See id. at 46:20-47:7 (Burke). The Court inquired how the United States felt about the Court ordering the USPO to send such a package, and the United States stated that it did not know enough to understand what difference it would make. See Tr. at 47:8-48:4 (Court, Castellano). The Court

---

[4]Jerry Roark is the New Mexico Corrections Adult Prison Division Director, and in 2014, he released a "white paper," or formal report, explaining the SNM's current presence in New Mexico prisons.

stated that it overrules the Objections -- leaving the PSR, First Addendum, and Second Addendum as is -- but would order the USPO to send Troup's "sentencing memorandum and [his] two objections with the package that goes to B[ureau of Prisons]." Tr. at 49:25-50:1 (Court).

The United States then noted that Troup filed all of his pleadings ex parte and questioned the need to seal the pleadings, because it did not see anything in the pleadings that necessitated their being sealed. See Tr. at 50:6-13 (Castellano). Troup repeated his concern that the PSR remain sealed, see Tr. at 50:25-51:1 (Burke), and the Court agreed that the PSR will remain sealed, because of the PSR's inclusion of personal information, which normally it is not disclosed, see Tr. at 51:3-5 (Court). Troup stated that it was fine to unseal his pleadings, see Tr. at 51:11 (Burke), and the Court provided that "the PSR will remain[] sealed[,] the addendums will remain[] sealed [and] they will be submitted to BOP [and] then the three documents that Mr. Troup filed will now be unsealed and they then will be sent to the Bureau of Prisons." Tr. at 51:22-52:1 (Court). Troup then asked for two minor corrections to the PSR, to which the United States did not object and which the Court made. See Tr. at 52:16-53:22 (Harbour-Valdez, Court, Castellano, Probation Officer).

Troup then argued his Motion, noting his family members present in the courtroom. See Tr. at 54:1-4 (Harbour-Valdez). The Court admitted as exhibits, with no objection, the letters that Troup's sister-in-law, nephews, sister, and mother provided. See Tr. at 54:9-55:9 (Court, Harbour-Valdez, Castellano). Troup admitted that a punishment of a term of years under 18 U.S.C.

§ 1959(a)(1) has not been recognized, so he understands that he must receive a sentence of life imprisonment, but filed the Motion "so that the Court and the Bureau of Prisons would know the man that [Troup's attorneys] have gotten to know over the past almost four years that [they have] been on this case." Tr. at 55:17-20 (Harbour-Valdez). See id. at 55:11-17 (Harbour-Valdez). Troup believed that "he never had a chance at life[,]" noting his abusive father, a childhood head injury, an early diagnosis of learning disabilities and hyperactive disorder, and an early drug addiction. Tr. at 55:24-25 (Harbour-Valdez). See id. at 55:25-56:4 (Harbour-Valdez). Troup reiterated that his addiction led to his commission of property crimes at age seventeen and eighteen, which is how he accumulated many of his criminal history points. See Tr. at 56:5-7 (Harbour-Valdez). Troup underscored that he wants the Court to focus on "the man he became in 2012[,]" when "he turned his life around" after making "a promise to his mom in 2012 that he was never going to go back to prison and he would do whatever it took to get clean and to stay straight and to lead a good life so that he could be there . . . for his family." Tr. at 56:16-23 (Harbour-Valdez). Troup noted that, during his time out of prison, he got married for the first time and held several jobs that he loved, even volunteering to work overtime. See Tr. at 56:23-25 (Harbour-Valdez).

Troup underscored that his employers "thought very highly of him" and that they stated that if Troup "gets out he will always have a job with [them]." Tr. at 57:2-5 (Harbour-Valdez). Troup provided that he was proud "that he had finally established credit" and "was able to get out to enjoy life, just be outdoors. Go fishing, just be with family." Tr. at 57:8-10 (Harbour-Valdez).

Troup stated that he had rescued a dog which he loved dearly. See Tr. at 57:10-11 (Harbour-Valdez). Troup also noted that he worked on overcoming his addiction, was clean for a significant period for the first time in his life, and had almost completely overcome the addiction by the time of his arrest in this case in 2015. See Tr. at 57:12-18 (Harbour-Valdez). Cori Harbour-Valdez, one of Troup's attorneys, specifically noted: "[V]ery few clients that I've encountered in my 21, 22 years of practice have made the kind of turn around in their life for the better." Tr. at 58:1-3 (Harbour-Valdez). Troup underscored that he lost five years of good time, because of the New Mexico Correction Department's belief of Troup's role in Sanchez' homicide. See Tr. at 58:3-10 (Harbour-Valdez). Troup also stated that, while incarcerated for this case, he rededicated his life to Christ and was baptized. See Tr. at 58:12-15 (Harbour-Valdez). Last, Troup stated that he would be appealing, and requested that the Court allow him to keep his discovery tablet and charger, his paperwork, and anything "that he needs to continue to review the transcripts and the evidence to assist [the] appe[llate] counsel with drafting that appeal." Tr. at 58:24-59:1 (Harbour-Valdez). See id. at 58:20-59:1 (Harbour-Valdez).

Troup then gave his allocution, stating: "I was never a violent person until I went to the Department of Corrections." Tr. at 59:13-14 (Troup). Troup noted that he was first incarcerated as a teenager and, "having a name like Edward Rex Troup in [a] New Mexican prison," Tr. at 59:19-20 (Troup), he had to fend for himself, such as when another inmate threatened to rape him in front of the whole pod, see Tr. at 59:15-24 (Troup). Troup stated that he never felt so scared in

- 54 -

his life than he did in that moment.  <u>See</u> Tr. at 59:24-25 (Troup).  Troup outlined that he paced his

"cell for a good five minutes" after the threat, and determined that he would not get raped by

another inmate, so he did what he had to do to ensure he did not get raped.  Tr. at 60:2 (Troup).

<u>See</u> <u>id.</u> at 60:3-6 (Troup).  Troup provided that, until his incarceration, he did not think that such

violence "existed[ed] inside the United States of America."  Tr. at 60:10-11 (Troup).  Troup

asserted that the New Mexico Corrections Department forced him to adapt to that violent world, a

world that he believes the New Mexico Corrections Department created.  <u>See</u> Tr. at 60:11-15

(Troup).  Troup underscored that he was free for almost two years "with no gang affiliation [and]

no drug affiliation," and "had a good relationship with my wife, my wife's kids[,] their families[,]

and my family."  Tr. at 60:16-19 (Troup).  Troup stated:

> I sit here today facing a sentence in federal prison because I could not be bought
> off by the federal Government.  I would rather die than to lie to the Government or
> FBI. . . .  I am what God [made] me to be.  But most of all out of all this bullshit I
> feel bad and sad for the victim's families [because] the Government did not solve
> the murders of Frank Castillo . . . or Freddie . . . .

Tr. at 60:20-61:3 (Troup).  Troup asserted that Castillo's murder was "already [solved] in 2004,"

Tr. at 61:4 (Troup), and wanted Castillo's family present in the courtroom "to know there was

DNA on the murder weapon of who killed Pancho [(Castillo)] in 2002 they, the Department of

Corrections knew exactly who killed him in 2001 [so t]he federal Government was not heroic in

solving Frank Castillo['s murder] it was solved back in 2001[,]" Tr. at 61:7-10 (Troup).  Troup

addressed Castillo's family: "I am more than willing to talk with you about everything the New

Mexico Department of Corrections has hidden from you since Pancho's death."  Tr. at 61:13-16

(Troup).  Troup contended that the New Mexico Corrections Department could have prevented

Sanchez' murder, because Sanchez asked to be placed in protective custody "several times,"

because of the hit out on him.  Tr. at 61:21 (Troup).  See id. at 61:16-21 (Troup).  Troup asserted

that he is facing federal prison for the New Mexico Corrections Department's negligence in not

moving Sanchez and thus stopping his death, and argued that the New Mexico Corrections

Department "will never accept responsibility for their crimes."  Tr. at 62:3-4 (Troup).  See id. at

61:21-62:3 (Troup).  Troup posited that "[t]he federal Government was not heroic in solving Fred

Sanchez['] death[;] it  was solved in 2007," and that "there was also DNA evidence of the person

who killed Fred."  Tr. at 62:8-11 (Troup).  Troup addressed Sanchez' family in the courtroom: "I

am more than willing to talk with you about all the hid[den] stuff the Department of Corrections

has not told you."  Tr. at 62:15-17 (Troup).

Troup asserted that Alonso "not only lie[d] to the jury[,] he lied to the federal prosecution[,]

he lied to the FBI[,] and he lied . . . in Judge Browning's courtroom."  Tr. at 62:19-21 (Troup).

Troup contended that Alonso's "most despicable lie" was his story concocted for the jury "that he

got that tattoo on his back that says soldier with and for God," noting that Alonso had that tattoo

when he killed Sanchez.  Tr. .at 63:1-3 (Troup).  See id. at 63:4-14 (Troup).  Troup stated that the

United States Attorneys, FBI agents, and the cooperators lied in the courtroom, and questioned

why they were allowed to lie and why they were not charged with perjury.  See Tr. at 63:14-64:6

(Troup).  Troup posited that "[t]he New Mexico Department of Corrections were the real [puppet] master[]s [behind] every assault and every murder and every suicide that ever happened while [Troup] was doing time," and that the PNM "used the SNM Gang for their own agendas to install fear within the prison populations here in New Mexico."  Tr. at 64:6-13 (Troup).  Troup stated that he "learned very quickly [that] violence is a way of life in [the] New Mexico penitentiary system," Tr. at 64:13-14 (Troup), and that "[n]o gang in New Mexico [runs] the prison system, . . . .  The wardens, the city, gang unit runs the prisons," Tr. at 64:15-17 (Troup).  Troup said: "You see I was in fact given an opportunity to sell all that I am for a free ticket to freedom[,] yet I could never do that because it would take what is rightfully mine, my manhood."  Tr. at 65:3-6 (Troup).  Troup returned to the perjury that he believed occurred, stating that it is "ridiculous" for America to pay United States Attorneys who allow their witnesses to lie, asserting that Alonso and E. Martinez were the most obvious liars.  See Tr. at 65:6-15 (Troup).  Troup stated that he was attacked with "tainted evidence and testimony" such that "[n]o man or woman had a chance."  Tr. at 66:8-9 (Troup).  Troup posited that he just wanted a fair trial, but that the United States' witnesses' "blatant disregard for the law" violated his rights and denied him justice.  Tr. at 66:14-15 (Troup). See id. at 66:9-19 (Troup).  Troup stated that both Torres and Jaramillo lied, because Troup was not involved in and had nothing to do with Castillo's murder; Troup maintained that he was in his cell asleep when Castillo got killed.  See Tr. at 66:19-67:11 (Troup).  Troup finished:  "I forgive

you all may God police and protect you always, and may you all live forever unlike me my death will be my blessing.  Thank you, sir."  Tr. at 67:15-18 (Troup).

The United States then approached the Court, showing a photograph of Castillo that his sister, Sandra Castillo, keeps with her and which she wanted the Court to see.  See Tr. at 68:16-69:4 (Castellano, Court).  S. Castillo then addressed the Court, stating that she has spent most days since her brother's murder eighteen years ago wondering why he "was the victim of such a senseless crime."  Tr. at 69:20-21 (S. Castillo).  See id. at 69:9-19 (S. Castillo).  She stated that her brother was abused until age fourteen, which caused him to retaliate and spend the rest of his life in detention centers and, eventually, prison.  See Tr. at 69:21-25 (S. Castillo).  S. Castillo stated that Castillo was set to be released the year he was killed and "was looking forward to living a different life with [her] help."  Tr. at 70:4-5 (S. Castillo).  See id. at 69:25-70:4 (S. Castillo).  S. Castillo underscored that Castillo "never got the chance to live a better life.  He never got to work.  He never got married.  He never got to raise his son."  Tr. at 70:10-12 (S. Castillo).  S. Castillo stated she is in "so much pain knowing that from a child to adulthood Frank never had a chance."  Tr. at 70:13-14 (S. Castillo).  S. Castillo provided that she believes her brother "had so much potential" and wondered what he would have accomplished "had his life not been taken so," noting that, while her brother "wasn't innocent by far," "he didn't deserve to die in such a horrific manner."  Tr. at 71:3-7 (S. Castillo).  She expressed stress over the fact that people whom Castillo trusted killed him, and S. Castillo believed that she would be able to cope better if strangers had

murdered Castillo.  See Tr. at 71:7-11 (S. Castillo).  S. Castillo stated that her brother must have

been confused that his friends, people he considered family, took his life, and this fact brings S.

Castillo sadness, anger, and confusion.  See Tr. at 72:1-4 (S. Castillo).  S. Castillo maintained that

her brother was not a rat and "didn't deserve this, and [that she is] sorry for Mr. Troup not being

able to continue living the best life that he was for the little bit of a chance that he did, but [her]

brother never, ever got that chance."  Tr. at 72:13-16 (S. Castillo).  See id. at 72:9-12 (S. Castillo).

The United States then requested that the Court deny Troup's Motion, because of "the

statutory penalties that the Court must impose in this case."  Tr. at 72:25-73:2 (Castellano).  See

id. at 72:23-25 (Castellano).  The United States contended that Alonso told "the truth about what

happened" and that, although "Mr. Troup disputes that," the United States believes Troup is "going

to go to the grave a very bitter man if he does not accept responsibility for what he did."  Tr. at

73:16-20 (Castellano).   The United States posited that "with tragic actions come tragic

consequences, and in this case those are consequences that warrant two life sentences based on the

convictions."  Tr. at 74:15-18 (Castellano).  The United States asked for justice so that Troup's

victims' families may start to find peace and for the Court to impose the two life sentences.  See

Tr. at 75:1-7 (Castellano).  Troup clarified that "[t]here is a reason why [accepting responsibility

is] not done at a sentencing hearing when an appeal is pending."  Tr. at 76:4-6 (Harbour-Valdez).

The Court then stated the sentence.  See Tr. at 10-12 (Court).  The Court overruled all of

Troup's Objections, with the exception of fixing in the PSR Patrick J. Burke's address and an

injury Troup suffered, that it considered the PSR's Guidelines application, and that it considered the 18 U.S.C. § 3553(a)(1)-(7) factors. <u>See</u> Tr. at 76:14-77:2 (Court). The Court stated that "the offense level is 43 and the criminal history category is [VI]. The guideline imprisonment term and the statutory term is life." Tr. at 77:3-6 (Court). Regarding the Guidelines, the Court stated that it considered the Guidelines range of life, and "conclude[d] that the punishment that's set forth in the guidelines is appropriate for this sort of offense," Tr. at 78:11-13 (Court), and

> that a sentence of life is not only adequate but it's necessary to reflect the serious[ness of the] offenses, promote respect for the law, provide just punishment, [provide] adequate deterrence [to] protect the public, [and that] the guideline sentence avoids unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct.

Tr. at 78:15-22 (Court). The Court imposed supervised release, to reintegrate Troup into society should he ever be released. <u>See</u> Tr. at 78:24-79:3 (Court). The Court concluded that the Guideline sentence of life reflects the 18 U.S.C. § 3553(a) factors and complies with the Sentencing Reform Act's purpose, so the Court denied the Motion. <u>See</u> Tr. at 79:3-12 (Court).

The Court provided its belief that it is constrained by statute, so, consistent with Congress' requirement, "as to each of counts one and three of" the Indictment 2:15-CR-04268-003 JB, "the defendant Edward [Troup] a/k/a Guero Troup is committed to the custody of the Bureau of Prisons for a term of life[,] said terms will run concurrently. The defendant is placed on supervised release for a term of five years as to each count, said terms shall run concurrently." Tr. at 79:15-20 (Court). <u>See</u> <u>id.</u> at 79:13-15 (Court). The Court then gave the conditions of supervised release with which

Troup will have to comply.  <u>See</u> Tr. at 79:22-86:16 (Court).  The Court did not order restitution, because no victim made a claim for restitution, or a fine, because of Troup's lack of financial resources.  <u>See</u> Tr. at 86:5-11 (Court).  The Court ordered that Troup immediately pay a special assessment of $100.00 per count.  <u>See</u> Tr. at 86:20-22 (Court).  With no reason why the sentence as provided should not be imposed, other than what had already been argued, the Court imposed the sentence.  <u>See</u> Tr. at 86:23-87:6 (Court, Castellano, Harbour-Valdez).  The Court also stated that it would issue an opinion on the Guidelines application.  <u>See</u> Tr. at 76:23-24 (Court).  This Memorandum Opinion and Order is that promised opinion.

## RELEVANT LAW REGARDING THE GUIDELINES

In <u>United States v. Booker</u>, the Supreme Court of the United States severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  <u>United States v. Booker</u>, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four statutorily defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

(A)       to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)       to afford adequate deterrence to criminal conduct;

(C)       to protect the public from further crimes of the defendant; and

(D)       to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a). To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined

tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007). The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'" United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349). A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d at 1264. This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the presumption of reasonableness "is an *appellate* court presumption" (emphasis in original); United States v. Conlan, 500 F.3d 1167, 1169-70 (10th Cir. 2007)(stating that "the government rightly concedes

the district court erred in affording a presumption of reasonableness to the recommended advisory sentence," because "the guideless are presumptively reasonable only at the appellate level"). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[5] Guidelines sentence. See Kimbrough v. United States, 552 U.S. at 90-91; Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 351.

---

[5]Attorneys and courts often say that the "Guidelines" are advisory, Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker, 543 U.S. 220 (2005)], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."), but it appears more appropriate to say that the resulting Guidelines ranges are advisory. The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

       The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure

_____

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.).

factors in the <u>Booker</u> calculus, even if the court does not grant a downward departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "'in a superior position to find facts and judge their import under § 3553(a)' in each particular case." <u>Kimbrough v. United States</u>, 552 U.S. at 89 (quoting <u>Gall v. United States</u>, 552 U.S. at 51).

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment *within the range* prescribed by statute." 530 U.S. at 481 (emphasis in original). The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Apprendi v. New Jersey</u>, 530 U.S. at 490. In <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in <u>Apprendi v. New Jersey</u>, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." <u>Blakely v. Washington</u>, 542 U.S. at 303 (emphasis in

original)(citing <u>Ring v. Arizona</u>, 425 U.S. 584, 602 (2002); <u>Harris v. United States</u>, 536 U.S. 545, 563 (2002)(plurality opinion), <u>overruled by</u> <u>Alleyne v. United States</u>, 570 U.S. 99 (2012)).   In <u>United States v. Booker</u>, however, the Supreme Court held that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime."   <u>United States v. Ray</u>, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing <u>United States v. Booker</u>, 543 U.S. at 259).  <u>See</u> <u>United States v. Booker</u>, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement."  (second alteration added by <u>United States v. Booker</u>)(quoting <u>United States v. Booker</u>, 543 U.S. at 221).  More recently, the Supreme Court held that the requirements in <u>Apprendi v. New Jersey</u> apply to facts that increase a defendant's mandatory minimum sentence.  <u>See</u> <u>Alleyne v. United States</u>, 570 U.S. at 103.

In <u>United States v. Magallanez</u>, 408 F.3d 672 (10th Cir. 2005)(McConnell, J.), the Tenth Circuit held that <u>Blakely v. Washington</u> and <u>United States v. Booker</u> did not change the district court's enhancement findings analysis.  <u>See</u> <u>United States v. Magallanez</u>, 408 F.3d at 684-85.  <u>United States v. Magallanez</u> involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine.  <u>See</u> 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing,

however, the judge -- based on government witnesses' testimony of the various amounts that they

had sold to the defendant -- attributed 1,200 grams of methamphetamine to the defendant and used

that amount to calculate his sentence under the Guidelines.  See 408 F.3d at 682.  The district

court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months,

based on the jury's 50 grams amount, to 121 to 151 months, based on the judge's 1,200 grams

amount.  See 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that, both before and after

Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to

consider the broad context of a defendant's conduct, even when a court's view of the conduct

conflicted with the jury's verdict."  408 F.3d at 684.  Although United States v. Booker made the

Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth

Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are

determined through application of the preponderance standard, just as they were before," United

States v. Magallanez, 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a

dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held

that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United

States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11

F.3d 1510, 1516 (10th Cir. 1993)).[6]  "[T]he application of an enhancement . . . does not implicate the Supreme Court's holding in *Apprendi v. New Jersey*."  United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.).  The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction."  United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005).  Accord United

---

[6]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation).  See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi v. New Jersey

only where the fact at issue increased his sentence beyond the statutory maximum. See United

States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not

assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory

maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir.

2014)(unpublished)[7](holding that, after Alleyne v. United States, "[i]t is well-established that

sentencing factors need not be charged in an indictment and need only be proved to the sentencing

judge by a preponderance of the evidence"). The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v.
> United States . . . expands the rule from Apprendi v. New Jersey, . . . (holding that
> facts that increase the maximum sentence a defendant faces must be proven to a
> jury beyond a reasonable doubt), to cover facts that increase the mandatory
> minimum sentence, as well as the maximum sentence, it does not prohibit district
> judges from continuing to find advisory sentencing factors by a preponderance of

---

[7]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that United States v. Hendrickson, United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008)(unpublished), United States v. Banda, 168 F. App'x 284 (10th Cir. 2006), United States v. Schmidt, 353 F. App'x 132 (10th Cir. 2009), United States v. Mendez, 272 F. App'x 703 (10th Cir. 2008)(unpublished), United States v. Fillman, 325 F. App'x 700 (10th Cir. 2000)(unpublished), and United States v. Talk, 446 F. App'x 114 (10th Cir. 2011)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

the evidence.  *See* [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL
4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.).  The

Tenth Circuit has clarified that the jury must decide "the facts which determine the mandatory

sentencing range," while "[t]he judge may make factual findings that will impact the sentence

imposed within that range, but the judge must retain discretion as to the sentence that will be

imposed based on those facts."  United States v. Haymond, 869 F.3d 1153, 1162 (10th Cir.

2017)(citing Alleyne v. United States, 570 U.S. at 103; United States v. Booker, 543 U.S. at 233).

Further, the Tenth Circuit determined that a district court could use its own finding on drug

quantity to enhance a defendant's Guidelines range consistent with Alleyne v. United States, "so

long as the court does not use its own drug quantity finding to alter the defendant's *statutory*

sentencing range."  United States v. Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in

original).

## **LAW REGARDING RELEVANT CONDUCT FOR SENTENCING**

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of

conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning

is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1 Application Note 1(I).  In

United States v. Booker, the Supreme Court notes:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity --
> depends for its success upon judicial efforts to determine, and to base punishment
> upon, the *real conduct* that underlies the crime of conviction.  That determination

is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," 18 U.S.C. § 1951(a), . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis and alterations in original). The Supreme Court's reasoning in

United States v. Booker suggests that the consideration of real conduct is necessary to effectuate

Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be

determined" based on the following:

(1)    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were --

(i) within the scope of the jointly undertaken criminal activity,

(ii) in furtherance of that criminal activity, and

(iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)    solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)    all harm that resulted from the acts and omissions specified in subsections

(a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)     any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The court may consider, as relevant conduct, actions that have not resulted in a conviction. Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Banda, 168 F. App'x 284, 289 (10th Cir. 2006)(unpublished)(stating that "there is no prohibition on considering hearsay testimony at sentencing, provided it bears indicia of reliability"); United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.), aff'd, 523 F.3d 1258 (10th Cir. 2008). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997). In Witte v.

United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  See 515 U.S. at 404-06.  The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991.  See Witte v. United States, 515 U.S. at 392-93.  In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association only with the defendant's latter attempt to import narcotics.   See Witte v. United States, 515 U.S. at 392-93.   At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and thus the court calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See Witte v. United States, 515 U.S. at 394.

    In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with his activities in 1990.  See Witte v. United States, 515 U.S. at 392-94.  The defendant moved to dismiss the indictment, contending that he had already been punished for the cocaine offenses, because the court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See Witte v. United States, 515 U.S. at 395. The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States.  See Witte v.

United States, 515 U.S. at 395.  The Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals opinions, including a Tenth Circuit opinion, that had previously considered this question.  See United States v. Witte, 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit decision.  See Witte v. United States, 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct does not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  Witte v. United States, 515 U.S. at 401. The Supreme Court reasoned that sentencing courts had always considered relevant conduct and agreed with the United States' argument that "[t]he fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  Witte v. United States, 515 U.S. at 402 (internal quotation marks omitted)(quoting Brief for the United States at 23, Witte v. United States, 515 U.S. 389 (1995)(No. 94-6187), 1995 WL 130559, at *23).

Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity." Witte v. United States, 515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted. See United States v. Watts, 519 U.S. at 149. The Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, "if the Government establishes that conduct by a preponderance of the evidence." United States v. Watts, 519 U.S. at 149 & n.1 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court began its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." United States v. Watts, 519 U.S. at 151 (internal quotation marks omitted)(quoting 18 U.S.C. § 3661). According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad

discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit caselaw adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts. See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause). In United States v. Banda, the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard." United States v. Banda, 168 F. App'x at 290. The Tenth Circuit explained that "[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the court's reliance on judge-found facts to enhance [the defendant's] sentence *mandatorily*." United States v. Banda, 168 F. App'x at 290 (alterations added by United States v. Banda, emphasis in United States v. Lauder)(internal quotation marks omitted)(quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)(Tymkovich, J.)).

In United States v. Coleman, the defendant appealed the district court's sentence enhancement for firearms possession after he was convicted of conspiracy to possess with intent to distribute and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime. See United States

v. Coleman, 947 F.2d at 1426, 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing the defendant's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) the weapons had been located at the arrest scene for several days; (ii) the weapons were handled at will by individuals who lived at the apartment; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing relevant federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  United States v. Coleman, 947 F.2d at 1429.

In United States v. Washington, the defendant argued that the United States needed to prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence. See United States v. Washington, 11 F.3d at 1512. The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison. See 11 F.3d at 1515. The defendant argued "that[,] because the additional drug quantities effectively resulted in a life sentence[,] a higher standard of proof should be required." United States v. Washington, 11 F.3d at 1515. Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." United States v. Washington, 11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)). See United States v. Sangiovanni, 2014 WL 4347131, at *22-26 (concluding that a sentencing court can cross reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, 59 F. Supp. 3d at 1314-17 (cross-referencing from the guideline for

being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court previously has held that it may consider a defendant's refusal to answer questions for the presentence investigation report, while not drawing an adverse inference from the refusal. See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. Feb. 13, 2012)(Browning, J.). The Court also has held that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence. See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.). Finally, the Court has held that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. United States v. Romero, No. CR 09-1253, 2012 WL 6632493, at *23 (D.N.M. Dec. 6, 2012)(Browning, J.).

## LAW REGARDING THE VULNERABLE VICTIM ADJUSTMENT

The vulnerable victim adjustment, U.S.S.G. § 3A1.1(b), provides:

> (b)    (1)     If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by **2** levels.
>
> (2) If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by **2** additional levels.

U.S.S.G. § 3A1.1(b)(1) (bold in original). Application Note 2 to U.S.S.G. § 3A1.1 explains:

For purposes of subsection (b), "**vulnerable victim**" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.

Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated by the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

U.S.S.G. § 3A1.1 Application Note 2 (bold in original). "In order to classify a victim as 'vulnerable,' 'the sentencing court must make particularized findings of vulnerability.'" United States v. Brunson, 54 F.3d 673, 676 (10th Cir. 1995)(quoting United States v. Lee, 973 F.2d 832, 834 (10th Cir. 1992)). "The focus of the inquiry must be on the 'victim's personal or individual vulnerability.'" United States v. Brunson, 54 F.3d at 676 (quoting United States v. Lee, 973 F.2d at 835).

"'[V]ulnerable victims' are those who are in need of greater societal protection." United States v. Brunson, 54 F.3d 673, 676 (10th Cir. 1995). "Specifically, the enhancement should apply

when the victim is 'less able to resist than the typical victim.'" United States v. Scott, 529 F.3d 1290, 1300 (10th Cir. 2008)(quoting United States v. Castaneda, 239 F.3d 978, 980 (9th Cir. 2001)). "Moreover, the vulnerable victim enhancement cannot be based solely on the victim's membership in a certain class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged." United States v. Smith, 133 F.3d at 749.

In United States v. Janusz, 135 F.3d 1319 (10th Cir. 1998), the Tenth Circuit held that an enhancement under U.S.S.G. § 3A1.1 was appropriate. See 135 F.3d at 1325. The enhancement was appropriate because the sentencing court "made specific findings as to the vulnerability of both [of the victims]. [One victim] was bedridden, unable to tend for himself, sick and extremely vulnerable." United States v. Janusz, 135 F.3d at 1325 (internal quotation marks omitted). The other victim "was confused about many things, very susceptible to suggestion from anyone, including the defendant [and] . . . was extremely trusting in many respects." United States v. Janusz, 135 F.3d at 1325 (internal quotation marks omitted). The enhancement was also appropriate because the sentencing court "found a nexus between [the victims]' vulnerability and the commission of the crimes." United States v. Janusz, 135 F.3d at 1325. The Tenth Circuit commented:

> It would be difficult, indeed, to imagine a stronger nexus. The evidence indicate[d that the defendant] recognized [the victims]' age, wealth, and diminished physical capacity, and believing they would both soon die . . . devised a scheme to separate them from their money by making loans which he would collect for himself after

- 82 -

their death.

United States v. Janusz, 135 F.3d at 1325 (citations omitted). The Tenth Circuit provides that the vulnerable victim enhancement is warranted where "the defendant selected and targeted this particular victim for the [offense] because of unusual characteristics." United States v. Pearce, 967 F.2d 434, 435 (10th Cir. 1992). The vulnerable victim enhancement, however, "does not require a finding that the defendant targeted the victim because of the victim's vulnerability." United States v. Checora, 175 F.3d 782, 789 n.4 (10th Cir. 1999). See United States v. Smith, 133 F.3d 737, 749 (10th Cir. 1997); United States v. Hardesty, 105 F.3d 558, 560-61 (10th Cir.1997).

## LAW REGARDING THE RESTRAINT-OF-VICTIM ADJUSTMENT

U.S.S.G. § 3A1.3 states that "[i]f a victim was physically restrained in the course of the offense, increase by **2** levels." U.S.S.G. § 3A1.3 (bold in original). "'***Physically restrained***' means the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1 Application Note 1(L) (bold in original). The examples of physical restraint in Guidelines "are merely illustrative and not exhaustive." United States v. Checora, 175 F.3d at 790 (citing United States v. Roberts, 898 F.2d 1465, 1479 (10th Cir. 1990)). The restraint-of-victim enhancement applies where "there [is] a forcible restraint of a victim which occurs during commission of the offense." United States v. Checora, 175 F.3d at 790 (footnote omitted). There does not have to be "physical touching of the victim," because "[k]eeping someone from doing something is inherent within the concept of restraint." United States v. Fisher, 132 F.3d 1327,

1329-30 (10th Cir. 1997)(applying § 3A1.3 where a "coconspirator deliberately kept the security guard at bay by pointing a gun directly at his head").  The Tenth Circuit has held that the restraint-of-victim enhancement applies when two defendants tackled a victim to the ground to prevent the victim from escaping.  See United States v. Checora, 175 F.3d at 790.  The restraint of the victim need not occur during the offense of conviction, as long as the restraining occurred as part of the relevant conduct.  See United States v. Holbert, 285 F.3d 1257, 1262-63 (10th Cir. 2002)("We hold that, for the purpose of applying § 3A1.3, the defendant must have physically restrained a victim in the course of the offense, and that the course of the offense includes any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).").

## LAW REGARDING MINOR ROLE ADJUSTMENT

Section 3B1.2 provides for a 2- to 4-level downward adjustment of a criminal defendant's offense level if the criminal was a "minor" or "minimal" participant in the crime for which he or she is being sentenced.  U.S.S.G. § 3B1.2.  The Tenth Circuit has determined that the district court has discretion over this downward adjustment and that the court only should grant it if the court finds that the defendant is less culpable than the other participants in the particular offense.  See United States v. Santistevan, 39 F.3d 250, 254 (10th Cir. 1994).  It is the defendant's burden to prove, by a preponderance of the evidence, that he or she was a minor participant.  See United States v. Mendez, 272 F. App'x 703, 705 (10th Cir. 2008)(unpublished)(citing United States v. Santistevan, 39 F.3d at 254).

The commentary to the Guidelines, which is authoritative unless it conflicts with federal law, states that the 4-level decrease for "minimal" participation will be used infrequently and should be reserved for "defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 Application Note 4. The 2-level decrease for "minor" participation applies to individuals who are "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 Application Note 5. "Finally, the Guidelines permit a three-level decrease for an individual whose culpability is somewhere between that of either a minimal or a minor participant." United States v. Santistevan, 39 F.3d at 254. See U.S.S.G. § 3B1.2.

The Tenth Circuit has repeatedly addressed the situation in which a drug courier requests a downward adjustment of offense level based on U.S.S.G. § 3B1.2. See, e.g., United States v. Martinez, 512 F.3d 1268, 1276 (10th Cir. 2008)(Tymkovich, J.); United States v. Rangel-Arreola, 991 F.2d 1519, 1524 (10th Cir. 1993); United States v. Arredondo-Santos, 911 F.2d 424, 426 (10th Cir. 1990); United States v. Calderon-Porras, 911 F.2d 421, 423 (10th Cir. 1990). The Tenth Circuit has consistently held that a defendant being a courier does not, ipso facto, render him or her a minor participant:

> [W]e have consistently "refused to adopt a per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier." *United States v. Rangel-Arreola*, 991 F.2d [at] 1524 . . . . We explained, "[d]rug couriers are an indispensable component of drug dealing networks." *Id.* To debate whether couriers as a group are less culpable would not be productive, "akin to the old

argument over which leg of a three-legged stool is the most important leg." *United States v. Carter*, 971 F.2d 597, 600 (10th Cir. 1992).

United States v. Martinez, 512 F.3d at 1276.  Courts must therefore make a fact-intensive inquiry whether the courier was, for reasons other than his or her mere status as a courier, a minor or minimal participant in the relevant crimes.

## LAW REGARDING CALCULATING CRIMINAL HISTORY

Section 4A1.1 of the U.S.S.G states, in relevant part: "The total points from items (a) through (f) determine the criminal history category in the Sentencing Table in Chapter Five, Part A."   U.S.S.G. § 4A1.1.   Subsection (a) states: "Add **3** points for each prior sentence of imprisonment exceeding one year and one month."   U.S.S.G. § 4A1.1(a) (bold in original).

Application Note 1 to U.S.S.G. § 4A1.1 states:

> Certain prior sentences are not counted or are counted only under certain conditions:
>
> > A sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense is not counted unless the defendant's incarceration extended into this fifteen-year period.  *See* § 4A1.2(e).
> >
> > A sentence imposed for an offense committed prior to the defendant's eighteenth birthday is counted under this subsection only if it resulted from an adult conviction.  *See* § 4A1.2(d).
> >
> > A sentence for a foreign conviction, a conviction that has been expunged, or an invalid conviction is not counted.  *See* § 4A1.2(h) and (j) and the Commentary to § 4A1.2.

U.S.S.G. § 4A1.1 Application Note 1.  Subsection (b) to U.S.S.G. § 4A1.1 states: "Add **2** points

for each prior sentence of imprisonment of at least sixty days not counted in (a)." (bold in original).

There is no limit to the number of points that may be added under either subsection (a) or subsection (b). See U.S.S.G. § 4A1.1 Application Notes 1, 2.

Section 4A1.2(d) handles "offenses committed prior to age eighteen." U.S.S.G. § 4A1.2(d) (title case omitted). It provides that, "[i]f the defendant was convicted as an adult and received a sentence of imprisonment exceeding one year and one month, add **3** points under § 4A1.1(a) for each such sentence." U.S.S.G. § 4A1.2(d) (bold in original). Application Note 7 to U.S.S.G. § 4A1.2 provides that,

> for offenses committed prior to age eighteen, only those that resulted in adult sentences of imprisonment exceeding one year and one month, or resulted in imposition of an adult or juvenile sentence or release from confinement on that sentence within five years of the defendant's commencement of the instant offense are counted.

U.S.S.G. § 4A1.2 Application Note 7.

Section 4A1.2(a)(2), which announces definitions and instructions for computing criminal history, provides:

> If the defendant has multiple prior sentences, determine whether those sentences are counted separately or as a single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (*i.e.*, the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Count any prior sentence covered by (A) or (B) as a single sentence.

U.S.S.G. § 4A1.2(a)(2). According to § 4A1.2(a)(2)'s plain language, if an intervening arrest

separates two sentences, the two sentences are considered separate for the purposes of criminal history calculation, even if the sentences were imposed at the same hearing.  See, e.g., United States v. Chavez, No. CR 18-0836 JB, 2018 WL 6621283, at *11 (D.N.M. Dec. 18, 2018)(Browning, J.).  If no intervening arrest separates two prior sentences, for the two sentences to be considered a single sentence, one of § 4A1.2(a)(2)'s preconditions must apply, and the sentences must have either emanated from the same charging instrument or been imposed on the same day.  See U.S.S.G. § 4A1.2(a)(2).  "That observation is, accordingly, the end of the debate for purposes of applying § 4A1.2(a)(2)."  United States v. Bhakta, No. CR 16-1090 JB, 2017 WL 4785953, at *9 (D.N.M. Oct. 21, 2017)(Browning, J.).

Section 4A1.1(e) provides: "Add **1** point for each prior sentence resulting from a conviction of a crime of violence that did not receive any points under (a), (b), or (c) above because the sentence was treated as a single sentence, up to a total of **3** points for this subsection."  U.S.S.G. § 4A1.1(e) (bold in original).  Application Note 5 to U.S.S.G. § 4A1.1 provides, in relevant part:

> In a case in which the defendant received two or more prior sentences as a result of convictions for crimes of violence that are treated as a single sentence (*see* § 4A.1.2(a)(2)), one point is added under § 4A1.1(e) for each such sentence that

did not result in any additional points under § 4A1.1(a), (b), or (c). A total of up to 3 points may be added under § 4A1.1(e).

U.S.S.G. § 4A1.1 Application Note 5 (italics in original).

## LAW REGARDING DOWNWARD DEPARTURES

"[T]he Guidelines place essentially no limit on the number of potential factors that may warrant a departure." Burns v. United States, 501 U.S. 129, 136 (1991), abrogated on other grounds by United States v. Booker, 543 U.S. 220 (2005). See United States v. Coleman, 188 F.3d 354, 358 (6th Cir. 1999)(en banc)(stating that "[t]here are a potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 (stating that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." Koon v. United States, 518 U.S. 81, 98 (1996). Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the

congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

For example, in United States v. Jim, 877 F. Supp. 2d 1018 (D.N.M. 2012)(Browning, J.), the Court did not grant a defendant's request for a downward departure under U.S.S.G. § 4A1.3(b), where the defendant argued that his criminal history category overrepresented the seriousness of his criminal history and the likelihood that he would commit other crimes. See 877 F. Supp. 2d at 1044-45. The Court noted that Jim's criminal history included: "(i) two DWI convictions; (ii) a conviction for Roadway Laned for Traffic; and (iii) Abandonment or Abuse of a Child." 877 F. Supp. 2d 1045. The Court concluded that a criminal history category of II did not over-represent Jim's criminal history, explaining that Jim's previous convictions involved alcohol and driving, demonstrating a pattern of aberrant use of alcohol also seen in the offense for which he was sentenced -- sexual assault -- as Jim asserted that both he and the victim were intoxicated at the time he assaulted the victim. See 877 F. Supp. 2d at 1022-23, 1044-45. The Court noted that "[i]t does not take much for a defendant to qualify for a criminal history category of II" and that the Court could not distinguish Jim's criminal history from that of other defendants that the Court regularly sees who also have a criminal history category of II, and thus denied Jim's request for a downward departure under U.S.S.G. § 4A1.3. 877 F. Supp. 2d at 1045.

In United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), the Court denied a defendant's request for a downward departure, under

U.S.S.G. § 5H1.11, based upon the defendant's eleven years of military service.  See 2011 WL 831279, at *10-11.  Even though Jager had received exemplary reviews in his performance reports, earning either the highest or second highest ratings possible, during his military career, the Court concluded that his service was not present in an unusual degree or distinguishable from other cases which the Guidelines cover.  See 2011 WL 831279, at *10-11.  The Court noted that in many child pornography cases, such as Jager's case, the defendant leads an exemplary life publicly, while engaging in a sordid secret life privately.  See 2011 WL 831279, at *11.  Additionally, Jager was not in intense combat during his military career; most of his time was spent in the support role of a mechanic.  See 2011 WL 831279, at *11.  The Court concluded, thus, that Jager's military service did not distinguish his case from those of many other defendants who commit child pornography, and the Court denied Jager's request for a downward departure.  See 2011 WL 831279, at *11.

## LAW REGARDING VARIANCES FROM THE GUIDELINES

After United States v. Booker, the sentencing guideline ranges are now advisory and are one of several factors set out in 18 U.S.C. § 3553(a).  Although appellate courts are allowed to assume that sentences within the Guidelines' ranges are reasonable, subject to rebuttal, the Supreme Court has made it clear that no presumption of reasonableness attaches at the district court level to the sentence that the Guidelines suggest.  See Gall v. United States, 552 U.S. at 50-51 (explaining that the sentencing judge "may not presume that the Guidelines range is reasonable," while "the appellate court may, but is not required to, apply a presumption of

reasonableness"); <u>Rita v. United States</u>, 551 U.S. at 351 (stating that "the presumption before us is an *appellate* court presumption" and that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply" (emphasis in original)).

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 17 U.S.C. § 3553(a)(2):

>　(A)　　to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>　(B)　　to afford adequate deterrence to criminal conduct;
>
>　(C)　　to protect the public from further crimes of the defendant; and
>
>　(D)　　to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).  Section 3553(a) also directs sentencing courts to consider: (i) the nature of the offense and the defendant's character; (ii) the available sentences; (iii) the sentencing guidelines and policy statements that the United States Sentencing Commission has promulgated; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  <u>See</u> 18 U.S.C. § 3553(a)(1), (3)-(7).

In <u>Kimbrough v. United States</u>, the Supreme Court stated that, in the ordinary case, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  552 U.S. at 89 (quoting <u>Rita v. United</u>

States, 551 U.S. at 350).  The Supreme Court recognized, however, that the sentencing judge is "'in a superior position to find facts and judge their import under § 3553(a)' in each particular case." Kimbrough v. United States, 552 U.S. at 89 (quoting Gall v. United States, 552 U.S. at 51). Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-entered the United States to be able to provide for his two children and two siblings was not materially different from other re-entry cases, and thus, no variance from the Guidelines sentence was warranted.  See United States v. Almendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).  On the other hand, in United States v. Jager, although Jager's military service was not present to an unusual degree and thus did not warrant a downward departure, the Court found that a variance was appropriate, because Jager's military service was "superior and uniformly outstanding," as Jager appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## ANALYSIS

The Court overrules all of Troup's Objections and adopts the PSR's Guidelines calculations.  The Court determines that the PSR's recitation of Troup's criminal history, calculation of criminal history points, and conclusion of category VI do not substantially overrepresent the seriousness of Troup's criminal history, and, thus, the Court exercises its discretion not to grant a downward departure.  The Court concludes that the Guidelines range of life imprisonment is adequate and necessary to comply with § 3553(a)'s factors, and, accordingly,

does not grant Troup's request for a variance to a sentence of 27-33 months or no more than 10-15 years.  See 18 U.S.C. § 3553(a).  The Court sentences Troup to the statutory requirement of life imprisonment on both Counts 1 and 3, with the terms running concurrently.

I.      **THE COURT MAY PROPERLY DETERMINE, BY A PREPONDERANCE OF THE EVIDENCE, THAT THE UNDERLYING CRIME OF CONVICTION IS FIRST-DEGREE MURDER.**

Troup contends that "calculat[ing] the base offense level based on a conviction for first degree murder would require improper judicial fact finding," because it "require[s] that the Court itself find that first degree murder was proven."  Objections at 7.  Troup argues that United States v. Booker, 543 U.S. 220 (2005) prohibits such factfinding, so the Court must assume that the jury convicted Troup under the Court's second-degree murder instruction.  Objections at 7.  The Court, however, may properly determine by a preponderance of the evidence which "offense level is applicable to the underlying racketeering activity," because the Court is doing so to apply the Guidelines in their proper, discretionary manner and is not mandatorily increasing Troup's sentence.  U.S.S.G. § 2E1.1(a)(2).  See, e.g., United States v. Fillman, 325 F. App'x 700, 707 (10th Cir. 2000)(unpublished).  The Court therefore determines that a preponderance of the evidence establishes that the underlying racketeering activity is first-degree murder and overrules Troup's Objection.

**A.** **THE COURT DOES NOT ENGAGE IN IMPROPER JUDICIAL FACTFINDING WHEN IT DETERMINES, BY A PREPONDERANCE OF THE EVIDENCE, THE FEDERAL OFFENSE TO WHICH THE UNDERLYING CONDUCT IS MOST ANALOGOUS.**

A jury of Troup's peers convicted Troup of two counts of violent crimes in aid of racketeering activity under 18 U.S.C. § 1959(a)(1) for his involvement in Castillo's and Sanchez' murders. See Verdict at 3. Where the violent crime in aid of racketeering activity is murder, as is the case here, the convicted defendants "shall be punished . . . by death or life imprisonment, or a fine under this title, or both[.]" 18 U.S.C. § 1959(a)(1). The Courts of Appeals have interpreted this provision as imposing a mandatory minimum sentence of life imprisonment. See, e.g., United States v. Chavez, 894 F.3d 593, 609 (4th Cir. 2018)(stating that § 1959(a)(1) "provides for punishment 'by death or life imprisonment,' and does not permit a district court to impose a shorter sentence regardless of mitigating circumstances," and that "the district court correctly applied the mandatory life sentence as written by Congress" (quoting 18 U.S.C. § 1959(a)(1))); United States v. Mahdi, 598 F.3d 883, 897 (D.C. Cir. 2010)(stating that "VICAR requires a minimum sentence of life for [] murder" (citing 18 U.S.C. § 1959(a)(1))); United States v. Crenshaw, 53 F. App'x 390, 390 (8th Cir. 2002)(stating that "murder in aid of racketeering activity[ is] a federal crime which carries a mandatory minimum sentence of life imprisonment" (citing 18 U.S.C. § 1959(a)(1))); United States v. James, 239 F.3d 120, 127 (2d Cir. 2000)(stating "that 18 U.S.C. § 1959(a)(1) carries a mandatory minimum sentence of life in prison"). The United States Court of Appeals for the Second Circuit reasoned that:

> [There is] no basis for concluding that Congress intended the unlikely result that, unless there were acceptable grounds for a downward departure, a judge was free to reject a death sentence or life imprisonment for a defendant convicted under 18 U.S.C. § 1959(a)(1), but only by sentencing that defendant to a fine without prison time.

United States v. James, 239 F.3d at 127.  Accord United States v. Carson, 455 F.3d 336, 385 n.44 (D.C. Cir. 2006)(providing that it is a "common sense conclusion that the VICAR statute does not permit a fine to be levied in lieu of imprisonment or death" (citing United States v. James, 239 F.3d at 127)).  Accordingly, Troup's two § 1959(a)(1) convictions carry mandatory life sentences.

Pursuant to Alleyne v. United States and Apprendi v. New Jersey, the Court may properly make findings of fact in deciding the proper advisory Guidelines range, because the maximum advisory sentence the Guidelines provide is life, which matches the statute's minimum sentence, and it does not exceed the statute's maximum sentence of death.  See Alleyne v. United States, 570 U.S. 103; Apprendi v. New Jersey, 530 U.S. at 490.  The Tenth Circuit has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United States v. Olsen, 519 F.3d at 1105 (quoting United States v. Washington, 11 F.3d at 1516).  Alleyne v. United States did not remove the sentencing court's ability to determine facts by a preponderance to calculate a sentence within the applicable statutory range.  See United States v. Haymond, 869 F.3d at 1162.  Further, making such findings does not violate United States v. Booker as Troup contends.  United States v. Booker prevents a sentencing court from applying a Guideline sentence mandatorily and reasserts that the sentencing court may not make findings that increase the

defendant's sentence beyond the maximum sentence found by the jury.  See 543 U.S. at 244

(Stevens, J., opinion of the Court in part); 543 U.S. at 264 (Breyer, J., opinion of the Court in part).

As the Tenth Circuit explained:

> Mr. Fillman asserts that the district court violated *Booker* when it found facts for
> the enhancements.  However, "*Booker* makes clear that judicial fact-finding by a
> preponderance of the evidence standard is unconstitutional only when it operates to
> increase a defendant's sentence *mandatorily*."  *United States v. Hall*, 473 F.3d
> 1295, 1312 (10th Cir. 2007)(emphasis added).  Here, the district court referred to
> the "advisory guideline range" and also the sentence was otherwise appropriate.
> R., Vol. IV, Tr. at 315-16 (Sentencing Hearing, dated July 23, 2007).  Accordingly,
> it is clear that the district court was applying the Guidelines in a discretionary
> manner, and there is no *Booker* violation.  *See Hall*, 473 F.3d at 1312.

United States v. Fillman, 325 F. App'x at 707.  Likewise, there is no United States v. Booker -- or

United States v. Alleyne -- violation here when the Court determines, by a preponderance of the

evidence, which murder offense applies to calculate the base offense level for the advisory

Guidelines sentence, which does not alter or exceed the statutory sentence.  See United States v.

Cassius, 777 F.3d at 1095 (concluding that the sentencing judge did not violate Alleyne v. United

States by using its finding of the quantity of crack cocaine, rather than the jury's finding, to

determine the defendant's base offense level); United States v. Cervantes-Chavez, 59 F. Supp. 3d

at 1315 (stating that Alleyne v. United States and Apprendi v. New Jersey do "not prohibit district

judges from continuing to find advisory sentencing factors by a preponderance of the evidence").

## B. THE COURT DETERMINES, BY A PREPONDERANCE OF THE EVIDENCE, THAT THE UNDERLYING CRIMES APPLICABLE TO CASTILLO'S AND SANCHEZ' MURDERS ARE FIRST-DEGREE MURDER.

The Guideline for violent crimes in aid of racketeering activity provides that the base offense level is the greater of: (i) 12; or (ii) "the offense level applicable to the underlying crime or racketeering activity." U.S.S.G. § 2A1.1. Here, the Indictment charged the murders as violating New Mexico state law, and the Court instructed the jury on murder under New Mexico law. See Indictment at 9-11 (citing N.M. Stat. Ann. § 30-2-1); Court's Instruction No. 31, at 46-47.[8] U.S.S.G. § 2A1.1 instructs that, "[i]f the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used." U.S.S.G. § 2E1.3 Application Note 1. The Court starts with the USPO's proposed offense: first-degree murder.

The Tenth Circuit allows the Court to use the Guideline for first-degree murder, U.S.S.G. § 2A1.1, as the most analogous offense in only two situations: (i) where "evidence presented at

---

[8]The Court explains in its Memorandum Opinion and Order, 2018 WL 2323236, filed May 22, 2018 (Doc. 2301)("Jury Instruction MOO"), that "[r]eferences to state law in federal racketeering statutes like VICAR -- 'in violation of the laws of in State,' 18 U.S.C. § 1959(a) -- and RICO -- 'which is chargeable under State law,' 18 U.S.C. § 1961(1)(A) -- define the conduct that violates federal law; those references do not incorporate state procedural or evidentiary rules." Jury Instruction MOO at 3, 2018 WL 2323236, at *1 (citing United States v. Crenshaw, 359 F.3d 977, 988 n.4 (8th Cir. 2004); United States v. Shyrock, 342 F.3d 948, 987 (9th Cir. 2003); United States v. Kehoe, 310 F.3d 579 (8th Cir. 2002)). The Court further states that, "[w]hile a statute-of-limitations defense does not apply in a federal VICAR prosecution, state-law defenses that mean that a defendant did not violate state law do apply." Jury Instruction MOO at 4, 2018 WL 2323236, at *2. The Court therefore overruled the Defendants' statute-of-limitations objection to the Court's Instruction No. 31. See Jury Instruction MOO at 5, 2018 WL 2323236, at *3.

trial or an evidentiary hearing demonstrates by a preponderance of the evidence that the defendant harbored malice aforethought and premeditation"; or (ii) if the "offense of conviction could serve as a predicate to the felony murder rule found in 18 U.S.C. § 1111(a)."  United States v. Fortier, 180 F.3d 1217, 1226 (10th Cir. 1999)(citing United States v. Nichols, 169 F.3d 1255, 1272-76 (10th Cir. 1999)).  The Court focuses on the first situation, as it is the only applicable one.  That the Tenth Circuit requires a preponderance of the evidence establishing the defendant's malice aforethought and premeditation is no surprise, because the Tenth Circuit has long required the preponderance-of-the-evidence standard at sentencing, and federal first-degree murder requires premeditation and malice aforethought.  See United States v. Olsen, 519 F.3d at 1105; Tenth Circuit Pattern Jury Instructions Criminal § 2.52, at 165.  Killing "with malice aforethought" means "to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life."  Tenth Circuit Pattern Jury Instructions Criminal § 2.52, at 165.  "[T]he use of a weapon or instrument, and the manner in which death was caused" may be considered in determining if "the killing was with malice aforethought."  Tenth Circuit Pattern Jury Instructions Criminal § 2.52, at 165.  "[E]vidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm" may establish malice aforethought.  United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000)(internal quotation marks omitted)(quoting United States v. Soundingsides, 820 F.2d 1232, 1237 (10th Cir. 1987)).

Premeditation "is the result of planning or deliberation"; it must be enough time "for the killer, after forming the intent to kill, to be fully conscious of that intent." Tenth Circuit Pattern Jury Instructions Criminal § 2.52, at 165.

The Court analyzes, for each murder, whether there is a preponderance of the evidence that Troup acted with malice aforethought and premeditation. First, regarding Castillo's murder, Lujan testified that B. Garcia wanted Castillo killed by strangulation in the early morning. See Transcript of Excerpt of Testimony of Leonard Lujan at 86:3-17 (taken April 23-24, 2018)(Lujan, Beck), filed May 16, 2018 (Doc. 2282)("Lujan Tr."). Lujan stated that Troup "wanted to volunteer" to kill Castillo after hearing of the greenlight on him, Lujan Tr. at 84:7 (Lujan); see id. at 84:4-7 (Lujan), but that Lujan never ordered Troup to kill Castillo, see Lujan Tr. at 354:2-5 (Beck, Lujan). Lawrence Torres testified that he saw Troup and DeLeon disassembling a laundry bag and, later, went upstairs to find heroin and looked around, because he saw "suspicious things," but Troup told Torres to go downstairs and said, "Get out of here. This doesn't concern you." Transcript of Excerpt of Testimony of Lawrence Torres at 30:13, 15-16 (taken April 24-25, 2018)(Torres), filed May 16, 2018 (Doc. 2283)("Torres Tr."). See id. at 30:9-31:7 (Armijo, Torres). Torres stated that, when he went upstairs, he saw Troup trying to hold Castillo's cell door closed, but then letting the door go so he could approach Torres and tell him to leave. See Torres Tr. at 34:14-35:3 (Armijo, Torres). Gerald Archuleta testified that B. Garcia stated "that he called that hit on Pancho because Pancho was writing kites at the Main facility, that Pancho wasn't worth a fuck, and that

everything [B. Garcia] called was legit."  Transcript of Excerpt of Gerald Archuleta at 55:17-20 (taken May 11, 2018)(Archuleta), filed May 23, 2018 (Doc. 2314)("Archuleta Tr.").  Jaramillo testified to a conversation he had with Gallegos and DeLeon, in which Gallegos "came up with a plan that [they] were going to go into [Castillo's] room in the morning, give him a shot of heroin, and them strangle him."  Jaramillo Tr. at 15:10-12 (Jaramillo).  Jaramillo stated that Gallegos ordered Troup to "come out in the morning and make sure that everybody stayed in their cells while [they] carried out the hit."  Jaramillo Tr. at 15:20-22 (Jaramillo).  Jaramillo described choking Castillo with his laundry bag.  See Jaramillo Tr. at 21:9-10 (Jaramillo); id. 22:3-5 (Jaramillo).  Jaramillo said that, when he left Castillo's cell, he saw Troup downstairs.  See Jaramillo Tr. at 23:4-6 (Beck, Jaramillo).  The Court therefore concludes, by a preponderance of the evidence, that not only was Castillo's murder planned, establishing that it was premeditated, but that his murderers acted deliberately and intentionally to strangle him to death, establishing malice aforethought.  See Tenth Circuit Pattern Jury Instructions Criminal § 2.52, at 165.  Accordingly, the underlying crime for Troup's § 1959(a)(1) conviction for Castillo's murder is most analogous to first-degree murder, establishing a base offense level of 43 under U.S.S.G. § 2A1.1.

Likewise, a preponderance of the evidence establishes that Troup participated in a premeditated killing of Sanchez with malice aforethought.  Cordova testified about unsuccessfully attempting to kill Sanchez by stabbing him with a shank, because of the paperwork out on Sanchez

showing he was a "rat." Transcript of Excerpt of Testimony of Billy Cordova at 33:1-34:12 (taken May 9-10, 2018)(Cordova, Castellano), filed May 23, 2018 (Doc. 2312)("Cordova Tr."). Alonso testified that, before Sanchez moved to their pod in the Southern New Mexico Correctional Facility, Alonso met with Troup to discuss how to complete the hit on Sanchez and to tell Troup that the Rascon brothers would be tasked with the murder. See Alonso Tr. at 29:11-30:4 (Beck, Alonso). Alonso stated that, in a meeting with the Rascon brothers and Troup, they discussed how to cover the cameras and that Troup suggested strangling Sanchez. See Alonso Tr. at 38:1-13 (Beck, Alonso). Alonso said that the Rascon brothers were stalling with the hit, and that Ernesto Guerrero from the pod next door sent word that Alonso, Troup, and the Rascon brothers would be killed if the Sanchez murder was not done. See Alonso Tr. at 40:3-41:2 (Alonso, Beck). After learning this information, Alonso met with Troup, told him that they needed to kill Sanchez right away, and asked Troup to distract Sanchez. See Alonso Tr. at 41:12-42:6 (Alonso, Beck). Alonso stated that Troup went into Sanchez' cell with a folder and held Sanchez' attention, so Alonso entered the cell, stood on the toilet, and joked around, until Sanchez came near him. See Alonso Tr. at 42:12-43:2 (Alonso, Beck). When Sanchez turned around, Alonso threw a rope around Sanchez' neck, slammed him to the ground, and then strangled him to death, as Troup held the bottom of Sanchez' body. See Alonso Tr. at 43:17-23 (Alonso). Clark testified that Troup told him that they enlisted the Rascon brothers to kill Sanchez, but when Frankie Gonzalez and Guerrero asked why the murder had not been executed, so Troup and Alonso decided to kill

Sanchez themselves.  <u>See</u> Clark Tr. at 56:11-25 (Beck, Clark).  Clark said that Troup discussed how Alonso wrapped a rope around Sanchez' neck and strangled him to death.  <u>See</u> Clark Tr. at 57:13-25 (Clark).  R. Rascon verified that Troup and Alonso told him to kill Sanchez, but he would not do it.  <u>See</u> Transcript of Excerpt of Testimony of Raymond Rascon at 10:17-11:5 (taken May 9, 2018)(Beck, R. Rascon), filed May 23, 2018 (Doc. 2311).  Samuel Gonzalez testified that Troup admitted to killing Sanchez after the murder, saying: "Got that fucker.  Fuck that rat."  Transcript of Excerpt of Testimony of Samuel Gonzalez at 23:14-15 (taken May 4, 2018)(Gonzalez), filed May 23, 2018 (Doc. 2308).  <u>See id.</u> at 23:3-17 (Castellano, Sanchez).

The Court therefore determines that a preponderance of the evidence establishes that Sanchez' murder was planned, which establishes premeditation, and that Troup and Alonso acted deliberately to intentionally kill Sanchez, which establishes malice aforethought.  <u>See</u> Tenth Circuit Pattern Jury Instructions Criminal § 2.52, at 165.  Accordingly, the underlying crime for Troup's § 1959(a)(1) conviction for Sanchez' murder is most analogous to first-degree murder, which establishes a base offense level of 43 under U.S.S.G. § 2A1.1.  The Court therefore overrules Troup's Objection to the use of the first-degree base offense level provided by § 2A1.1, and concludes that the USPO properly put Troup's base offense level for Counts 1 and 2 at 43.

## II. THE COURT DETERMINES THAT A PREPONDERANCE OF THE EVIDENCE ESTABLISHES THAT CASTILLO AND SANCHEZ WERE VULNERABLE VICTIMS UNDER § 3A1.1(b)(1).

Troup also objects to the 2-level adjustment that the USPO imposes under U.S.S.G. § 3A1.1(b)(1) for a vulnerable victim in both Counts 1 and 3. The USPO imposes this adjustment, because it asserts that Castillo and Sanchez were vulnerable by virtue of their incarceration and inability to escape. See Second Addendum at 2 (citing United States v. Tapia; United States v. Lambright). The Court first provides background on the vulnerable victim enhancement and then conducts individualized analyses for each victim.

The 2-level enhancement for a vulnerable victim applies where the victim of the offense of conviction "is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct," and "the defendant knows or should have known of the victim's unusual vulnerability." U.S.S.G. § 3A1.1 Application Note 2. The Tenth Circuit has explained that the adjustment should apply where "the victim is *unusually* vulnerable or *particularly susceptible* to the crime committed," and where the victims "are unable to protect themselves [and] therefore require greater societal protection." United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002)(emphasis in original). In United States v. Tapia, the United States Court of Appeals for the Eleventh Circuit reviewed the district court's decision that an incarcerated government informant, whom other prisoners assaulted, was a vulnerable victim for U.S.S.G. § 3A1.1's purposes. See 59 F.3d at 1143. The Eleventh Circuit concluded that there was no error

- 104 -

in the application of the enhancement to the appellants' convictions under 18 U.S.C. § 1513 (retaliating against a witness, victim, or informant), determining that the district court "correctly concluded that [the victim], as an individual, was particularly vulnerable by virtue of his incarceration with Appellants and his inability to escape, and that [the victim] was targeted because of this vulnerability." 59 F.3d at 1143. In United States v. Lambright, the Fifth Circuit upheld a U.S.S.G. § 3A1.1 enhancement where a corrections officer killed an inmate. See 320 F.3d at 518. The district court concluded that the inmate was a vulnerable victim, because "he was completely dependent upon the care of the correction officers, . . . was locked in his cell prior to the assault, and . . . he could not protect himself from the assault." 20 F.3d at 518.

Here, the SNM targeted Castillo, because of his alleged cooperation with law enforcement. See Lujan Tr. at 78:12 (Lujan)(stating that Castillo was a "rat" and needed to be killed); Transcript of Excerpt of Testimony of Manuel Jacob Armijo at 40:11-14 (taken April 26-27, 2018)(M. Armijo), filed May 16, 2018 (Doc. 2284)("M. Armijo Tr.")(stating that B. Garcia had Castillo hit, because "he had went against [the SNM] in the Main facility back in the '90s"). The SNM prohibits snitching, and issues greenlights, requiring death, on those who break that rule. See Lujan Tr. at 12:16-23 (Beck, Lujan)(stating that "the biggest" rule of the SNM is "don't snitch" and that those who do are "going to get hit"); id. at 73:10-12 (Beck, Lujan)(stating that being a rat gets "an automatic greenlight"); id. at 78:13-16 (Beck, Lujan)(discussing B. Garcia issuing a hit on Castillo, because he was a rat); M. Armijo Tr. at 178:2-3 (Sindel, M. Armijo)(stating SNM may

put hits on those who talk to the cops). Castillo's greenlight made him particularly vulnerable to being murdered, because, if he survived, those responsible would get killed. See Lujan Tr. at 87:8-14 (Beck, Lujan)(stating that, if Lujan did not follow B. Garcia's order to form a team to kill Castillo, B. Garcia likely would have put a greenlight on Lujan); id. at 415:22-24 (Lujan)("If you didn't do it [(follow orders)], then you were going to be the one greenlighted[.]"); M. Armijo Tr. at 184:12-16 (Sindel, M. Armijo)(stating that it is SNM's rule to kill informants, and those who do not are subject to a hit). Further, Castillo's particular vulnerability to being killed increased because of Castillo's incarceration with other SNM members who knew about the greenlight, were ordered to act on it, and had easy access to act on it. See, e.g., Lujan Tr. at 87:18-23 (stating that Lujan would follow an order from somebody who "had push within the SNM"); Jaramillo Tr. at 164:4-8 (Cooper, Jaramillo)(stating that, when a member gets confirmation "that somebody has got to get hit, he needs to go forward with that and make sure those people get hit"). Gallegos, DeLeon, and Jaramillo targeted Castillo specifically because of the greenlight. See Lujan Tr. at 83:21-84:4 (Lujan)(stating that Lujan told J. Gallegos that B. Garcia ordered Lujan to choose people to kill Castillo, and that Lujan chose J. Gallegos, Jaramillo, and DeLeon); Jaramillo Tr. at 14:20-22 (stating that J. Gallegos informed Jaramillo and DeLeon that they "were going to be taking out" Castillo); United States v. Pearce, 967 F.2d at 435 (stating that U.S.S.G. § 3A1.1(b)(1) is justified where "the defendant selected and targeted this particular victim for the [offense] because of unusual characteristics"). Troup wanted to volunteer to kill Castillo, ostensibly because

of the greenlight. See Lujan Tr. at 83:23-84:12 (stating that Lujan believed Troup wanted to volunteer, after describing the hit on Castillo). Further, Castillo's murderers had easy access to Castillo, because they were housed together, and they specifically attacked Castillo in his cell, where it would be harder for Castillo to escape. See Jaramillo Tr. at 12:16-18 (Beck, Jaramillo)(providing that Jaramillo and Castillo were housed in the same unit); id. at 14:10-12 (Beck, Jaramillo)(providing that J. Gallegos was housed next door to Jaramillo); id. at 19:17-22 (Jaramillo)(stating that J. Gallegos, Jaramillo, and DeLeon entered Castillo's cell and strangled him); United States v. Tapia, 59 F.3d at 1143 (applying the vulnerable victim enhancement where the victim was incarcerated with his attackers and unable to escape). Further, J. Gallegos, DeLeon, and Jaramillo outnumbered Castillo in his small cell, and specifically waited to attack Castillo until Castillo had ingested heroin, so they could use Castillo's vulnerable, distracted, and intoxicated state to their advantage. See Jaramillo Tr. at 15:10-12 (stating that the murder plan was to enter Castillo's "room in the morning, give him a shot of heroin, and then strangle him"); id. at 19:20-22 (stating that "as soon as [Castillo] was done injecting the heroin, Joe and Angel grabbed him, rolled him over onto his bed, and [Jaramillo] began to choke him out"); United States v. Talk, 446 F. App'x 114, 124 (10th Cir. 2011)(unpublished)(allowing the enhancement where intoxication renders the victim incapable of defending himself); United States v. Checora, 175 F.3d at 788 (upholding U.S.S.G. § 3A1.1(b)(1)'s application where the victim was outnumbered, drunk, and had little ability to defend himself). Accordingly, the Court determines that credible testimony

establishes, by a preponderance, that Castillo was vulnerable, because the SNM had hit on him, he was incarcerated with other SNM members who were ordered to act on the hit, he was outnumbered, he was intoxicated from the heroin, and he had limited ability to defend himself or escape from the surprise attack in his cell. Troup knew or should have known of these particular vulnerabilities, because he was privy to the planning of Castillo's murder, acted as a lookout to prevent others from interfering with the murder, and held Castillo's cell door closed to prevent his escape. The Court accordingly applies the 2-level enhancement under U.S.S.G. § 3A1.1(b)(1) to Count 1 and overrules Troup's Objection.

The SNM similarly targeted Sanchez to be killed for his cooperation with law enforcement. See Clark Tr. at 49:22-50:1 (Beck, Clark)(stating that Sanchez cooperated with law enforcement); Cordova Tr. at 34:1-2 (Cordova)(stating that Sanchez was a rat). The SNM prohibits snitching, and issues greenlights, requiring death, on those who break that rule. See Lujan Tr. at 12:16-23 (Beck, Lujan)(stating that "the biggest" rule of the SNM is "don't snitch" and that those who do are "going to get hit"); id. at 73:10-12 (Beck, Lujan)(stating that being a rat gets "an automatic greenlight"); M. Armijo Tr. at 178:2-3 (Sindel, M. Armijo)(stating that those who talk to the police can get hit). Like Castillo, Sanchez' greenlight made him particularly vulnerable to being murdered, because, if did not die, SNM would kill those tasked with the murder. See Lujan Tr. at 415:22-24 (Lujan)("If you didn't do it [(follow orders)], then you were going to be the one greenlighted[.]"); M. Armijo Tr. at 184:12-16 (Sindel, M. Armijo)(stating that it is SNM's rule to

kill informants, and those who do not kill informants are subject to a hit). Further, Sanchez' incarceration with other SNM members who knew about the greenlight, were ordered to act on it, and had easy access to act on it increased Sanchez' particular vulnerability to being killed, which is underscored by Cordova's failed attempt to kill him. See, e.g., Cordova Tr. at 347:3-15 (Castellano, Cordova)(stating that, upon learning Sanchez snitched, Cordova attempted to stab him); Transcript of Excerpt of Testimony of Raymond Rascon at 10:14-24 (May 9, 2018)(Beck, Rascon), filed May 23, 2018 (Doc. 2311)(stating that Troup and Alonso told him to kill Sanchez); Alonso Tr. at 27:3-11 (Beck, Alonso)(stating that Sanchez' paperwork was passed through the pod, which is "[e]ssentially a death sentence," because of the prohibition on snitching). Alonso and Troup targeted Sanchez specifically because of the greenlight, and the threat to their own lives if they did not follow through with it. See Alonso Tr. at 29:24-30:3 (Alonso)(stating that, after seeing Sanchez' paperwork but before Sanchez moved to their pod, Alonso and Troup discussed how to complete the hit on Sanchez if he moved to their pod); id. at 36:14-21 (Alonso)(providing that Guerrero wanted Alonso to make sure the hit was completed and that the Rascon brothers "took care of what they were supposed to do"); id. at 40:23-41:2 (Alonso)(stating that Guerrero said: "Make sure it gets done, or we're going to come in here and get you guys and take you guys out."); id. at 41:9-17 (Beck, Alonso)(stating that, in response to that threat, Alonso met Troup and told him, "It's going down," meaning they were going to kill Sanchez "like right now"); United States v. Pearce, 967 F.2d at 435 (stating that U.S.S.G. § 3A1.1(b)(1) is justified where "the

defendant selected and targeted this particular victim for the [offense] because of unusual characteristics").  Further, Troup and Alonso had easy access to Sanchez, because they were housed in the same pod.  See Alonso Tr. at 27:126-18 (Beck, Alonso)(stating that Sanchez did not live in 1-AB pod when Alonso saw his paperwork, but later moved into that pod); id. at 50:1-8 (Beck, Alonso)(providing that Troup and Alonso were housed in 1-AB pod).  Troup and Alonso hampered Sanchez' ability to defend or escape by Troup distracting Sanchez so Alonso could jump on Sanchez.  See Alonso Tr. at 42:12-43:19 (Alonso, Beck).  Accordingly, the Court determines by a preponderance of the evidence that Sanchez was vulnerable because of the SNM's hit on him, his incarceration with other SNM members who were ordered to act on the hit, and his limited ability to defend himself or escape from the surprise attack in his cell.  Troup knows or should have known of these particular vulnerabilities, because he was privy to the planning of Sanchez' murder and served to distract Sanchez so Alonso could attack him.  The Court accordingly applies the 2-level enhancement under U.S.S.G. § 3A1.1(b)(1) to Count 3 and overrules Troup's Objection.

### III.    THE COURT DETERMINES, BY A PREPONDERANCE OF THE EVIDENCE, THAT CASTILLO AND SANCHEZ WERE PHYSICALLY RESTRAINED WHILE BEING STRANGLED AND THAT APPLYING U.S.S.G. § 3A1.3 DOES NOT CONSTITUTE IMPERMISSIBLE DOUBLE COUNTING.

Troup also objects to the USPO's application of the 2-level enhancement under U.S.S.G. § 3A1.3 for physical restraint of the victims.  Troup argues that applying this enhancement requires engaging in prohibited double counting, see First Addendum Response at 6, because any physical

restraint occurred during Castillo's and Sanchez' strangulations, and was thus "part and parcel of the crime itself," Objections at 10. The USPO maintains that the enhancement applies, because the victims' cells had only "one entrance and exit," and the cells' close quarters prevented the victims from being able to fight off their "assailants or escape while being held down and strangled by multiple individuals." First Addendum at 3. The USPO also notes that Troup served as the lookout during Castillo's murder and "helped prevent [Castillo] from leaving his cell as he was murdered," and that "Troup held [Sanchez'] legs as he was being strangled by another individual." Second Addendum at 3. The Court first analyzes whether the enhancement applies and then determines whether applying the enhancement constitutes impermissible double counting.

### A. A PREPONDERANCE OF THE EVIDENCE ESTABLISHES THAT THE RESTRAINT-OF-VICTIM ENHANCEMENT APPLIES TO BOTH CASTILLO'S AND SANCHEZ' MURDERS.

U.S.S.G. § 3A1.3 applies where the "victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. The Guidelines Manual counsels that the restraint-of-victim enhancement does not apply "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself." U.S.S.G. § 3A1.3 Application Note 2. The Guidelines Manual defines the term "physically restrained" as "the forcible restraint of the victim such as being tied, bound, or locked up." U.S.S.G. § 1B1.1 Application Note 1(L). These examples "are merely illustrative and not exhaustive." United States v. Rodella, No. CR 14-2783, 2015 WL 711941, at *27 (D.N.M. Feb. 5,

2015)(Browning, J.)(citing United States v. Checora, 175 F.3d at 790). The Tenth Circuit has advised that the restraint-of-victim enhancement applies where "there [is] a forcible restraint of a victim which occurs during commission of the offense." United States v. Checora, 175 F.3d at 790 (footnote omitted).

Apart from the restraint inherent in strangulation, the Court concludes that the trial testimony establishes by a preponderance of the evidence that both victims were physically restrained in the course of their murders. See United States v. Baumann, 60 F. App'x 63, 64 (9th Cir. 2003)(upholding district court's application of § 3A1.3 where it applied the enhancement, not because of the victim's strangulation, but because of the defendant's "forcible confinement of [the victim] to the bathroom and his pinning her to the bathroom floor in a manner that prevented her escape"). Castillo's strangler, Jaramillo, stated that Gallegos and DeLeon "grabbed [Castillo] by his arms and rolled him over onto his bed." Jaramillo Tr. at 21:5-6 (Jaramillo). See id. at 19:19-22 (Jaramillo)(same). Jaramillo clarified that Gallegos and DeLeon had Castillo "[f]acing the wall on top of the bed." Jaramillo Tr. at 21:19 (Jaramillo). See id. at 21:15-18 (Beck). Jaramillo described Gallegos' and DeLeon's restraint as "hold[ing] down" Castillo. Jaramillo Tr. at 174:1 (Jaramillo)(describing DeLeon's participation in Castillo's murder); id. at 174:6 (describing Gallegos' participation in Castillo's murder). Further, there is evidence that Troup closed Castillo's cell door to prevent his escape. See Torres Tr. at 34:14-35:3 (Armijo, Torres). This evidence establishes that Gallegos and DeLeon restrained Castillo to facilitate Jaramillo's

strangling of him and to prevent his escape. This restraint is sufficient for § 3A1.3 to apply. See United States v. Ivory, 532 F.3d 1095, 1106 (10th Cir. 2008)(upholding the enhancement's application where the defendant took an action meant to "trap or immobilize" the victim); United States v. Checora, 175 F.3d at 790 (applying the enhancement where the defendants tackled the victim to the ground to prevent his escape). Further, even though Troup did not touch Castillo, Troup restrained him by closing the door to prevent him from leaving the cell. See United States v. Fisher, 132 F.3d at 1329-30 (providing that the enhancement does not require touching, as "[k]eeping someone from doing something is inherent within the concept of restraint"). Accordingly, the Court concludes that Castillo was physically restrained during his murder.

Likewise, Sanchez' strangler, Alonso, testified that, after Alonso slammed Sanchez to the ground, Troup held the bottom of Sanchez' body while Alonso strangled Sanchez. Alonso Tr. at 43:18-23 (Alonso). Clark testified that Troup told him that Alonso grabbed Sanchez, threw him to the floor, and stood on his back to strangle him, while Troup fell on Sanchez' legs. See Clark Tr. at 57:13-15 (Clark). While these testimonies are slightly different, the Court notes that Alonso was present at the murder while Clark was not and that hearsay evidence, to which Clark testified, is suspect. Clark's testimony about what Troup said, however, supports Alonso's testimony in that Alonso slammed Sanchez to the floor. Alonso physically restrained Sanchez by slamming him to the floor to facilitate the strangulation by keeping Sanchez under his control and to impede his movement. See United States v. Checora, 175 F.3d at 791 (stating that restraint occurs where

the defendant takes an action to "prevent the victim from doing something" or to "keep the victim within bounds or under control). Further, the Court credits Alonso's testimony that Troup held Sanchez' lower body, which is also physical restraint. See United States v. Ivory, 532 F.3d at 1106 (upholding the enhancement's application where the defendant acted to "trap or immobilize" the victim). Accordingly, the Court determines that Sanchez was physically restrained during his murder and, therefore, § 3A1.3 applies.

B.   **APPLYING THE RESTRAINT-OF-VICTIM ENHANCEMENT TO THE GUIDELINES CALCULATION FOR BOTH COUNTS 1 AND 3 DOES NOT CONSTITUTE IMPERMISSIBLE DOUBLE COUNTING.**

The Tenth Circuit has stated that, while generally "impermissible 'double counting' occurs 'when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes,'" sometimes "the Guidelines themselves provide an alternative principle of double counting." United States v. Joe, 696 F.3d 1066, 1070 (10th Cir. 2012)(quoting United States v. Reyes Pena, 216 F.3d 1204, 1209 (10th Cir. 2000)). Where the "particular guideline specifically speaks to double counting, such an instruction would be controlling" over the general double-counting analysis. United States v. Coldren, 359 F.3d 1253, 1256 (10th Cir. 2004). U.S.S.G. § 3A1.3, the restraint-of-victim enhancement, instructs courts not to "apply this adjustment where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself (*e.g.* this adjustment does not apply to offenses covered

- 114 -

by § 2A4.1 (Kidnapping, Abduction, Unlawful Restraint)).”  U.S.S.G. § 3A1.3 Application Note 2.  Accordingly, the Court must determine whether the violent crimes in aid of racketeering offense Guideline specifically incorporates the restraint-of-victim enhancement or whether the Tenth Circuit's definition of physical restraint is an element of violent crimes in aid of racketeering.  See United States v. Joe, 696 F.3d at 1070 (applying this analysis for a different offense).

In United States v. Joe, the Tenth Circuit analyzed “what it means for one Guideline enhancement to specifically incorporate another enhancement” and rejected the United States' contention that such determination should be limited to an examination of “only the express language of the offense guideline.”  696 F.3d at 1070.  Instead, the Tenth Circuit determined that the United States' approach is impracticable, because the Guidelines are “extremely terse,” and United States v. Coldren's precedent constrains the Tenth Circuit.  United States v. Joe, 696 F.3d at 1071.  See id. at 1070 (citing United States v. Coldren, 359 F.3d at 1256).  The Tenth Circuit, thus, provides that a court deciding whether a Guideline incorporates § 3A1.3 “must determine whether the offense *conduct* specifically addressed whether the victim was physically restrained.”  United States v. Joe, 696 F.3d at 1071 (emphasis in original).

Here, the offense conduct in both Counts 1 and 3 is first-degree murder committed in aid of racketeering activity -- or VICAR murders.  VICAR has five elements: (i) an enterprise within the definition of enterprise in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 (“RICO”); (ii) the enterprise engaged in racketeering activity; (iii) the defendant's

membership in the enterprise; (iv) the defendant committed murder; and (v) the defendant's general purpose in committing murder was to maintain or increase his position in the enterprise. United States v. Kamahele, 748 F.3d 984, 1007 (10th Cir. 2014); United States v. DeLeon, 15-CR-4268 JB, 2017 WL 305411, at *37 (D.N.M. June 30, 2017)(Browning, J.). As previously discussed, first-degree murder is a premeditated killing with malice aforethought. See, e.g., Tenth Circuit Pattern Jury Instructions Criminal § 2.52, at 165; United States v. Kelly, 1 F.3d 1137, 1140 n.2 (10th Cir. 1993). Murder does not by its nature require physical restraint of the victim, even by the Tenth Circuit's broad definition of the term "physical restraint."[9] See First Addendum Response at 7 (contrasting strangulation to "shooting the victim, or stabbing her, or poisoning her, all of which can take place without 'the forcible restraint of the victim'" (quoting U.S.S.G. § 1B1.1 Application Note 1(L)). Cf. United States v. Joe, 696 F.3d at 1072 (concluding that "it appears to be impossible to commit the offense of aggravated sexual abuse under § 2241(a)(1) without also applying a force that, in our circuit, constitutes physical restraint of the victim"). The Court therefore concludes that neither the offense Guideline nor the offense itself specifically incorporates physical restraint, so there is no impermissible double counting.

---

[9]Although it is possible that the victim's death is the ultimate act of physical restraint by preventing the victim from ever moving again, the Tenth Circuit has not gone that far. The Court, therefore, does not conclude that death constitutes physical restraint. But see United States v. Mikalajunas, 936 F.2d 153, 156 (4th Cir. 1991)(stating that "[e]very murder involves the ultimate restraint").

Furthermore, even by Troup's definition of double counting, the Court concludes that applying § 3A1.3 does not constitute impermissible double counting. In his First Addendum Response, Troup quotes the United States Court of Appeals for the Eighth Circuit's opinion in United States v. Hipenbecker, 115 F.3d 581 (8th Cir. 1997), for its definition of double counting: "Double counting occurs when 'one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines.'" United States v. Hipenbecker, 115 F.3d at 583 (quoting United States v. Alexander, 48 F.3d 1477, 1492 (9th Cir. 1995)). Troup asserts that the base offense level for first-degree murder incorporates the strangulations in which he was convicted, which is "a brutal if intimate form of killing, and it compels conduct that amounts to the physical restraint of the victim," so applying the restraint-of-victim enhancement on top of this offense level for the same conduct is double counting. First Addendum Response at 7. The Court agrees that applying the restraint-of-victim enhancement for the acts of strangulation would fall under Troup's definition of double counting, but the Court is not applying the restraint-of-victim enhancements because of the strangulations. The Court detailed the acts of restraint on which it rested § 3A1.3's applicability in the last subsection, namely the fact that both victims were held down while somebody else strangled them. The base offense level or another part of the Guidelines does not account for the victims' being held down in the course of their strangulations, which is harmful conduct.

The Court therefore concludes that applying § 3A1.3 to Counts 1 and 3 does not constitute impermissible double counting. The Court therefore overrules Troup's Objection. The Court will apply the 2-level enhancement for restraint-of-victim to Counts 1 and 3 as the PSR provides.

## IV. THE COURT DETERMINES THAT TROUP HAS NOT PRODUCED OR NOTED SUFFICIENT EVIDENCE ESTABLISHING, BY A PREPONDERANCE, THAT HE IS ENTITLED TO A MINOR ROLE ADJUSTMENT IN BOTH CASTILLO'S AND SANCHEZ' MURDERS.

Troup maintains that his role in both murders was minor, so a 2-level reduction for a minor role is appropriate under U.S.S.G. § 3B1.2(b). <u>See</u> Objections at 10. Troup argues that this adjustment applies, because he was not the strangler in either case and because he would have been killed had he not followed the SNM's orders to complete the hits. <u>See</u> Objections at 10. The USPO maintains that Troup's role in both murders led to the victims' deaths, so his roles "cannot be seen as mitigating." First Addendum at 3. The United States agrees with the USPO and notes that Troup bears the burden of establishing his entitlement to the reduction. <u>See</u> United States' Response at 5.

The Guidelines define a minor participant as a one "who is less culpable than most other participants in the criminal activity." U.S.S.G. § 3B1.2 Application Note 5. A defendant "who performs a limited function in the criminal activity may receive an adjustment under this guideline." U.S.S.G. § 3B1.2 Application Note 3(A). In determining whether Troup was a minor participant in the murders, the Court may consider: (i) "the degree to which the defendant understood the scope and structure of the criminal activity"; (ii) "the degree to which the defendant

participated in planning or organizing the criminal activity"; (iii) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority"; (iv) "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts"; and (v) "the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2 Application Note 3(C).

The Court concludes that Troup's conduct cannot be accurately described as "limited" or as "substantially less culpable than [an] average participant" in the murders. U.S.S.G. § 3B1.2 Application Note 3(A) (title case omitted). Troup volunteered to participate in the Castillo murder -- he was not ordered to participate in it -- and he participated by closing Castillo's cell door to prevent his escape, and by acting as the lookout to prevent both witnesses and interference with the murder. See Lujan Tr. at 83:23-84:12 (providing that Lujan believed Troup wanted to volunteer in Castillo's hit, but Lujan did not trust Troup and did not want him to participate); id. at 354:2-5 (Beck, Lujan)(stating that Lujan did not order Troup to murder Castillo); Clark Tr. at 63:4-6 (Clark)(providing that Troup told Clark that he closed Castillo's door); Torres Tr. at 34:14-35:3 (Armijo, Torres)(describing Troup trying to hold Castillo's cell door closed during the murder). Further, Troup was present at the meeting where Lujan ordered Gallegos, DeLeon, and Jaramillo to strangle Castillo early in the morning. See Lujan Tr. at 86:1-23 (Beck, Lujan). These facts prevent the Court from concluding that Troup is entitled to a minor-participant reduction for

his role in Castillo's murder.  See United States v. Adams, 751 F.3d 1175, 1180 (10th Cir. 2014)(upholding district court's decision to deny the defendant's minor-participant reduction request where the defendant "acted as the lookout, planned to assist in the escape, and admitted to knowledge of the scheme").  Troup has not established that this conduct was "substantially less culpable than [an] average participant" in Castillo's murder and in his briefing compares himself only to Jaramillo, the strangler.  U.S.S.G. § 3B1.2 Application Note 3(A) (title case omitted).  See Objections at 10; First Addendum Response at 8-9.  Troup has not met his burden, and the Court will not grant the reduction.

Troup and Alonso learned of the hit on Sanchez, and began discussing how they would act on the hit should Sanchez ever be moved to their pod -- a possibility which Alonso stated he did not think would occur.  See Alonso Tr. at 29:24-30:3 (Alonso).  Alonso stated that Troup, in response to a letter, said that the Rascon brothers would be ordered to act on Sanchez' hit.  See Alonso Tr. at 30:23-31:6 (Beck, Alonso).  Then, after Sanchez moved to their pod, Troup, Alonso, and the Rascon brothers met in Troup's cell to discuss murdering Sanchez, and Troup suggested that they strangle him.  See Alonso Tr. at 37:11-13 (Beck, Alonso).  The Rascon brother failed to carry out the hit and Guerrero threatened to help the people tasked with murdering Sanchez if the hit was not carried out; Alonso learned of Guerrero's threat so he had Troup distract Sanchez so he could carry out the hit.  See Alonso Tr. at 40:21-43:19 (Beck, Alonso).  Troup held Sanchez' lower body as Alonso strangled him with a rope.  See Alonso Tr. at 43:21-23 (Alonso).  When

Alonso told Troup his hands were hurting, Troup encouraged him to keep strangling Sanchez and, at one point, asked Alonso if he wanted Troup to take over strangling Sanchez. <u>See</u> Alonso Tr. at 43:25-44:6 (Alonso). This evidence shows that Troup was instrumental in the planning for Sanchez' murder -- even before the possibility of carrying out the hit arose with Sanchez' move to Troup's pod -- and aided in the plan's success by holding Sanchez down and encouraging Alonso to strangle Sanchez. Accordingly, the Court cannot conclude that Troup is entitled to a minor-participant reduction for his role in Sanchez' murder. Troup has not established that this conduct was "substantially less culpable than [an] average participant" in Castillo's murder. U.S.S.G. § 3B1.2 Application Note 3(A) (title case omitted). The Court concludes that Troup has not met his burden of proof in establishing that he was a minor participant in either murder and therefore overrules Troup's Objection.

**V.     THE COURT DETERMINES THAT THE PSR'S RECITATION OF TROUP'S CRIMINAL HISTORY DOES NOT SUBSTANTIALLY OVERREPRESENT THE SERIOUSNESS OF TROUP'S CRIMINAL HISTORY OR THE LIKELIHOOD THAT HE WILL COMMIT OTHER CRIMES, SO THE COURT WILL NOT GRANT TROUP A DOWNWARD DEPARTURE.**

Troup argues that "his criminal history is substantially overrepresented" so "a downward departure, under § 4A1.3 to Criminal History Category V is appropriate." Objections at 11. Troup maintains that seven of his criminal history points "were for non-violent offenses" when he "was only 18-19 years old." First Addendum Response at 9. Further, Troup contends that "the accumulation of these points took place so long ago that it is overstating Mr. Troup's Criminal

History to rely on such dated convictions." First Addendum Response at 9. The United States asserts that Troup provides "no reliable information whatsoever to establish that [his] criminal history category is substantially over-represented" and notes that Troup committed two murders while incarcerated. United States' Response at 6. The USPO maintains that Troup's "criminal history category is accurately represented," First Addendum at 3, and does not overrepresent his criminal history, see Second Addendum at 3.

A downward departure is appropriate where "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b). "[I]n departing from the otherwise applicable criminal history category," the Court must provide "the specific reasons why the applicable criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(c)(2). The Guidelines' Commentary provides that "[a] downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." U.S.S.G. § 4A1.3 Application Note 3. The Sentencing Commission provides the § 4A1.3 policy statement because it "recognizes that the criminal history score is

unlikely to take into account all the variations in the seriousness of criminal history that may occur." U.S.S.G. § 4A1.3 Background.

The Tenth Circuit has stated that § 4A1.3 is meant to allow the sentencing "court to deviate from the otherwise applicable guideline range where a defendant's criminal history, likelihood of recidivism, or both differ significantly from the typical offender for whom the typical offender for whom the applicable criminal history category was formulated." United States v. Collins, 122 F.3d 1297, 1304 (10th Cir. 1997), superseded by statute, Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub. L. No. 108-21, 117 Stat. 650 (changing the discretionary review standard). The defendant bears the burden of establishing that a downward departure is warranted. See United States v. Sierra-Castillo, 405 F.3d 932, 938 (10th Cir. 2005).

The Court notes that while the convictions of which Troup complains are over twenty-years old, the murders constituting the offenses of conviction are also old because they occurred twelve and eighteen years ago. Further, Troup committed these murders while he was incarcerated. The Court has reviewed the PSR's calculation of Troup's criminal history and concludes that the PSR accurately calculates Troup's total criminal history score at 25,[10]

---

[10]Troup Objects to the PSR's paragraph 65, which gives Troup 3 points for his 18-month sentence for a felon in possession offense, because the details of the offense could not be located. See Objections at 10; PSR ¶ 65, at 19. As discussed in the next section, the Court overrules this Objection and therefore these points are included in Troup's criminal history calculation.

establishing a criminal history category of VI. The Court notes that only 13 criminal history points are needed to reach a criminal history category of VI; even removing the 7 points that Troup maintains "were accumulated in an eleven-month period when Mr. Troup was only 18-19 years old" still puts him at 18 criminal history points, and a criminal history category of VI. First Addendum Response at 9. See U.S.S.G. ch. 5, pt. A. Troup has proffered no "reliable information," or any evidence whatsoever, that a criminal history category of VI substantially overrepresents the seriousness of his criminal history or the likelihood that he will reoffend. U.S.S.G. § 4A1.3(b).

Troup's criminal history is extensive, with many felonies that the Court cannot construe fairly as minor. Troup's first adult conviction was for harboring a felon and contributing to the delinquency of a minor, because he and a minor helped a felon escape from custody and avoid detection. See PSR ¶ 60, at 16. He has many convictions involving firearms or reckless driving. See PSR ¶¶ 61, 65-67, at 16-17, 19-21. Troup has many parole violations for reoffending, using drugs, and absconding from supervision. See PSR ¶¶ 60-61, 63-64, 66, at 16-20. He has many instances of trying to evade police officers, including concealing his identity, using his vehicle to assault a police officer, and failing to stop when a police officer attempted to pull him over. See PSR ¶¶ 60-63, 66, at 16-19. Counsel represented Troup in all of these convictions that led to criminal history points. See PSR ¶¶ 60-68, at 16-21. The Court sees no sound reason to conclude

that a criminal history category of VI substantially overrepresents the seriousness of this criminal history.

The Court recognizes that many of Troup's convictions stem from a drug addiction which he maintains he has overcome.  See Tr. at 38:2-6 (Burke); Motion ¶ 6, at 2.  The Court commends Troup for achieving sobriety.  The Court sees no reason to conclude, however, that a criminal history category of VI substantially overrepresents the likelihood that Troup will reoffend.  Troup received his last prison sentence on January 29, 2004, and murdered Sanchez while serving that term of incarceration.  See PSR ¶ 22, at 11 (stating Sanchez was found dead on June 17, 2007); id. ¶ 68, at 21 (providing Troup's last sentence was imposed on January 29, 2004).  Troup was released from prison on May 7, 2012, and, because he violated his parole on numerous occasions, was incarcerated for approximately ten months.  See PSR ¶ 67, at 20-21; Motion ¶ 4, at 2.  Troup spent approximately thirty-three months as a free man before his arrest in this case.  See Motion ¶ 4, at 2.  The Court is sentencing Troup for two violent murders in which he participated while incarcerated, as part of a notorious prison gang.  The Court concludes that Troup remains within the heartland of defendants typically labeled category VI, and, although a departure is authorized, a departure is not warranted, and the Court will not exercise its discretion to depart.

## VI. THE COURT WILL NOT STRIKE THE PSR'S PARAGRAPHS 6-16, 17-18, 20-21, 26-31, OR 65.

Troup requests that the Court strike the PSR's paragraphs 6-16, 17-18, 20-21, 26-31, and 65.  See Objections at 1.  Troup's Objections to paragraphs 6-16 stems from the USPO's reliance

on prosecutor's files to obtain the information contained in these paragraphs. <u>See</u> Objections at 2. Troup contends that the USPO's reliance on the prosecutor's files to define the offense conduct is "irregular and inappropriate," because a trial has occurred. Objections at 3. <u>See id.</u> at 2. Troup's Objection to paragraphs 17 and 18 is that these paragraphs rely on Torres' statements, which he contends are false. <u>See</u> Objections at 3. Troup does not provide why he wants to strike paragraph 20. <u>See generally</u> Objections. Troup objects to paragraph 21 as "a terrible misstatement of the facts presented at trial." Objections at 5. Troup objects to paragraph 25 and asks to add information to the paragraph about who entered the cell. <u>See</u> Objections at 5. Troup does not provide why he wants to strike paragraphs 26-30. <u>See generally</u> Objections. Troup objects to the portion of paragraph 31 stating that he held Sanchez' legs as Alonso strangled him, because Troup maintains that all the Court can conclude is that "Troup engaged in conduct that distracted Freddie Sanchez momentarily, allowing Javier Alonso to jump on Sanchez from behind." Objections at 6. <u>See id.</u> at 5. Troup asserts that paragraph 65 "should be stricken because the details of the offense could not be located." Objections at 10.

The Court agreed that the USPO's reliance on prosecutor's files, rather than the extensive evidence revealed at trial, to prepare the PSR is inappropriate, and ordered the USPO to prepare an addendum using trial testimony to support the PSR's facts. The Second Addendum relies on trial testimony to assert that the PSR's information is accurate. <u>See generally</u> Second Addendum. As to paragraph 65, the First Addendum states that, although the USPO could not locate offense

details, the "Secure Court Case Access website" provides the paragraph's information, which the USPO has verified. See First Addendum at 3. At Troup's sentencing, the Court inquired whether, in light of the Second Addendum, it could overrule Troup's factual Objections. See Tr. at 46:2-18 (Court). Troup responded that the Court's proposal would work for him. See Tr. at 46:19 (Burke). Accordingly, the Court overrules Troup's factual Objections, and will not strike paragraphs 6-16, 17-18, 20-21, 26-31, or 65. The Court adopts the PSR's facts as its own, and, having overruled all of Troup's Objections to the Guideline sentence calculation, adopts the PSR's calculation of the advisory Guideline sentence. As to both Counts 1 and 3, Troup's criminal history category is VI with a total offense level of 43, for which the Sentencing Commission recommends a life sentence. See U.S.S.G. ch. 5, pt. A.

At the hearing, Troup provided that his "real concern" is the PSR going "to the BOP Classifications people" and that his desire is for "balance[,] so when the Classifications people see the paperwork that comes with [Troup] they get a [f]uller view of him." Tr. at 45:18-20, 22-24 (Burke). Troup wanted them to "get a feel for some of [his] more recent history." Tr. at 49:19-20 (Burke). The USPO agreed to the Court's suggestion that she send Troup's sentencing pleadings to the Bureau of Prison's Classification Office along with the PSR. See Tr. at 48:19-23 (Court, Probation Officer). Accordingly, the Court will order the USPO to send to the Bureau of Prison's Classification Office: (i) the Objections; (ii) the Motion; and (iii) the First Addendum Response.

**VII.   THE COURT WILL NOT VARY DOWNWARD AND WILL SENTENCE TROUP TO TWO CONCURRENT SENTENCES OF LIFE IMPRISONMENT.**

The advisory Guideline sentence for both of Troup's convictions here is life imprisonment. Troup contends that this sentence "is harsher than what is necessary to achieve the sentencing objectives of 18 U.S.C. § 3553(a)" and that "the Court has sufficient basis for a downward variance based on the factors set forth in 18 U.S.C. § 3553(a)."  Motion at 1.  Troup maintains "that a variance to a sentence of 10 to 15 years would" sufficiently reflect § 3553(a)'s factors.  Motion at 8.  The United States contends that, because Troup's convictions have a statutory mandatory penalty of life imprisonment, "the Court is not authorized to grant . . . a variance pursuant to 18 U.S.C. § 3553(a)."  United States' Response at 6 (citing 18 U.S.C. § 1959(a)(1)).  The Court agrees that Troup's convictions under § 1959(a)(1) impose a mandatory sentence of life imprisonment, as discussed <u>supra</u> section I.A.  The Court also agrees that it cannot consider the § 3553(a) factors to vary below the statutory minimum.   "As a matter of law, the district court [is] not authorized . . . to consider factors other than substantial assistance in sentencing below the statutory minimum."  <u>United States v. A.B.</u>, 529 F.3d 1275, 1280 (10th Cir. 2008).  Troup has not offered substantial assistance to the United States.  There is no statutory authority for the Court to vary below the mandatory life sentences in this case.  <u>See</u> <u>United States v. Campbell</u>, 995 F.2d 173, 175 (10th Cir. 1993)("When a sentence is fixed by statute, any exception to the statutory directive must also be given by statute.").  The Court therefore sentences Troup to Congress'

requirement of life imprisonment for his two § 1959(a)(1) convictions, which will run concurrently.

The Court could, theoretically, calculate a Guideline sentence, and then sentence Troup to the statutory minimum.  The Court thus will rule on Troup's Motion to complete its duty of accurately calculating the advisory Guidelines sentence, even though it is an academic exercise. The Court has carefully considered the Guidelines, but, in arriving at its sentence, has taken account of not only the Guidelines, but the Sentencing Reform Act's other sentencing goals. Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense committed by the applicable category of defendant.  The Court has identified several factors that put downward pressure on a Guideline sentence and several that put upward pressure to keep the sentence within the applicable Guideline range.  Some of these factors overlap, and some go on both sides of the ledger.   In considering these factors, the Court underscores that it "must impose a sentence sufficient, but not greater than necessary, to comply" with the need of the imposed sentence:

> (A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)      to afford adequate deterrence to criminal conduct;
>
> (C)      to protect the public from further crimes of the defendant; and
>
> (D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

The Court has identified seven factors which put downward pressure on Troup's Guideline sentence. First, Troup's history and characteristics put downward pressure on the sentence. Troup's father was physically abusive toward only him, and not his siblings, until Troup's parents divorced when he was fourteen. See PSR ¶ 78, at 23. Troup has remained in contact with his mother, and states that his "mother, sister, and other family members still actively support him." Motion ¶ 13, at 4. See PSR ¶ 77, at 23. Troup was married to Kim Gallegos and, although they do not have children together, Troup's stepchildren "remain supportive of him during this time." PSR ¶ 81, at 24. See id. ¶ 81, at 23. Troup reports that, while he has struggled with addiction for years, he received Suboxone treatment to break his heroin addiction and, while he could not finish this treatment before his arrest in this case, "he [has] completed his removal from heroin on his own" and achieved sobriety. Motion ¶ 6, at 2. Troup dropped out of high school, but later completed his GED while incarcerated. See PSR ¶ 87, at 25. Further, Troup is currently forty-seven, being sentenced for crimes that occurred over a decade ago, and maintains that he has matured since then. See Motion ¶ 17, at 6. Second, one of the factors that often puts downward pressure -- although in this case, also puts upward pressure on the sentence -- is the need for the sentence to provide just punishment. Third, another factor that often puts downward pressure -- although it, too, puts upward pressure on the sentence in many cases, including this one -- is the need for the punishment to promote respect for the law, i.e., a sentence that the community and

the bar do not regard as inappropriately given. Fourth, while the Court's task, as a district judge, is to not simply to arrive at a reasonable sentence, but to calculate a sentence that fairly, effectively, and fully promotes the § 3553(a) factors, the Court is always mindful that the defendant, the Tenth Circuit, and the public will ultimately review the sentence for reasonableness -- a perception which often, as in this case, puts downward pressure on the sentence. See United States v. Roybal, 188 F. Supp. 3d 1163, 1220 (D.N.M. 2016)(Browning, J.)(citing United States v. Cronin, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." (citation omitted))). To the Court, reasonableness means that the sentence is not greater than necessary to promote § 3553(a)'s purposes. Fifth, Troup's physical ailments, including "serious left-brain damage," put downward pressure on the sentence. PSR ¶ 83, at 24. See id. ¶ 82, at 24. Sixth, the New Mexico Corrections Department took from Troup about five years of good time credit, because of the Sanchez murder, much of which Troup served in solitary conditions. See Motion ¶ 12, at 4. Seventh, Troup has not received an incident report or dirty UA during his incarceration in this case. See Motion ¶ 7, at 3.

There are eleven factors, however, that put upward pressure on the sentence and suggest that the advisory Guideline sentence of life is appropriate. First, Troup has a lengthy criminal history and, although he has not been identified as a career offender for the federal offenses for

which the Court is sentencing him, the State of New Mexico has identified him as a habitual offender.  See PSR ¶¶ 67-68, at 20-21.  Second, Troup has not performed well on probation in the state system, which the many parole violations and revocations evidence.  See PSR ¶¶ 60-61, 63-64, 66, at 16-20.  Third, Troup committed the federal offenses for which the Court is sentencing him while incarcerated for other crimes, which suggests a lack of deterrence and rehabilitation. Fourth, the sentence must promote respect for the law by reflecting a sense of fairness.  Fifth, the sentence must reflect the seriousness of these brutal murders by a violent prison gang in prison. Sixth, the sentence must provide just punishment for these two brutal murders.  Seventh, the sentence must provide just deterrence at both the general and specific levels.  The Court is especially concerned that a lower sentence will not adequately deter Troup, a SNM member who became volunteered to commit brutal murders in prison, from reoffending.  Eighth, the Court must protect the public from Troup's criminal behavior.  Ninth, the Court notes the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  The Court notes that it has sentenced all of Troup's co-Defendants on Counts 1 and 3 who went to trial -- namely Gallegos, B. Garcia, and A.A. Garcia -- to life sentences.  Tenth, the need to produce a reasonable sentence counsels for a Guidelines sentence -- or at least exerts upward pressure on the sentence -- where there are no facts that suggest a variance below the Guidelines is appropriate.  Again, the Court's role in promoting reasonableness is forming a sentence that is sufficient to promote § 3553(a)'s goals.  Eleventh,

federal government resources available in the BOP can help support Troup in his sobriety and provide medical treatment as needed.

Accordingly, the Court concludes that the punishment set forth in the Guidelines is appropriate for these offenses. The Court has also considered the kinds of sentences and ranges that the Guidelines establish. The Court concludes that a life sentence for each Count is necessary and adequate to reflect the seriousness of the offenses, promote respect for the law, provide just punishment, afford adequate deterrence at the general and specific levels, protect the public, avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and provides Troup with needed education, training, and care to help him deal with the issues that led him to this point. The Court concludes that this sentence fully, fairly, and adequately promotes § 3553(a)'s factors. The Court also concludes that this sentence is reasonable, that is, that the sentence is sufficient without being greater than necessary to reflect the factors in § 3553(a). The Court also sentences Troup pursuant to Congress' directive in § 1959(a)(1) and imposes the mandatory term of life imprisonment as to each Count, to run concurrently. The Court places Troup on a term of supervised release for five years as to each Count, also to run concurrently.

**IT IS ORDERED** that: (i) Edward Troup's Objections to the Presentence Investigation Report (Doc. 2591) and Motion to Strike Paragraphs 6-13, 17, 18, 20, 21, 26-31, and 65 of the Presentence Investigation Report and Motion to Order the Government to Include These

Objections in the Materials Sent to the Bureau of Prisons BOP, filed April 26, 2019 (Doc. 2621), are overruled, and granted in part and denied in part; (ii) Edward Troup's Conditional Motion for Downward Variance, filed May 10, 2019 (Doc. 2648), is denied; and (iii) the United States Probation Office shall send to the Bureau of Prisons the additional materials Troup requested.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    *Attorneys for the Plaintiff*

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

    *Attorney for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

    *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

    *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

    *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

    *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

    *Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Joseph E. Shattuck
Marco & Shattuck
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

    *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Eduardo Solis
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

*Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

*Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

  *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias Attorney at Law
Albuquerque, New Mexico

  *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

  *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

  *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

*Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and--

Ray Velarde
El Paso, Texas

*Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

*Attorneys for Defendant Mauricio Varela*

Richard Jewkes
El Paso, Texas

--and--

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

*Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Brusuelas-Benavidez
Albuquerque, New Mexico

*Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

*Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

> *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

> *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

> *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

--and--

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C.
Corrales, New Mexico

*Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

*Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

*Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

*Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*